**In re: CALPINE CORPORATION SECURITIES LITIGATION**

**This Document Applies to All Consolidated Actions.**

**No. C 02–1200 SBA.**

United States District Court, N.D. California.

Aug. 28, 2003.

&#x26ad;636

Thomas E. Bilek, Hoeffner & Bilek LLP, Houston, TX, Peter A. Binkow, Glancy & Binkow LLP, Los Angeles, CA, Patrice L. Bishop, Stull, Stull & Brody, Los Angeles, CA, J. Thomas Bowen, Esq., Davis Cowell & Bowe, LLP, San Francisco, CA, Gregory M. Egleston, Bernstein Liebhard & Lifshitz LLP, New York, NY, Lionel Z. Glancy, Glancy & Binkow LLP, Los Angeles, CA, Jeffrey M. Haber, Bernstein Liebhard & Lifshitz, LLP, New York, NY, Christopher T. Heffelfinger, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA, Ashley Kim, Schoengold & Sporn P.C., Joseph C. Kohn, Kohn Swift & Graf P.C., Philadelphia, PA, Jeffrey H. Konis, Bernstein Liebhard & Lifshitz LLP, Christopher Lometti, Schoengold & Sporn P.C., New York, NY, Jay P. Saltzman, Schoengold & Sporn, P.C., New York, NY, Joseph R. Seidman, Jr., Bernstein Liebhard & Lifshitz, LLP, Denis F. Sheils, Kohn Swift & Graf P.C., Philadelphia, PA, Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pu, San Francisco, CA, for Plaintiff.

Tracy M. Clements, Krieg, Keller, Sloan, Reilley & Roman, San Francisco, CA, Paul H. Dawes, Latham & Watkins, Menlo Park, CA, Jordan David Eth, Melvin R. Goldman, Robert L. McKague, Christopher A. Patz, Morrison & Foerster LLP, San Francisco, CA, Jay L. Pomerantz, Latham & Watkins, Menlo Park, CA, Stan G. Roman, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

ARMSTRONG, District Judge.

This is a consolidated putative securities class action brought against defendant Calpine Corporation ("Calpine") and other defendants pursuant to Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o. Mansukh B. Makadia and Laborers Local 1298 Pension Fund ("Plaintiffs") have been named co-lead plaintiffs for the putative class.

Now before the Court are two motions to dismiss brought by two sets of defendants pursuant to Federal Rule of Civil Procedure 12(b)(6): (1) the Individual Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint for Failure to State a Claim (the "Individuals' Motion"), filed by defendants Peter Cartwright, Ann B. Curtis, Charles B. Clark, Jr., E. James Macias, and Paul J. Posoli (collectively, the "Individual Defendants"); and (2) Defendant Calpine Corporation's Motion to Dismiss Second Consolidated Amended Class Action Complaint ("Calpine's Motion"), filed by defendant Calpine alone.[1] Having read and considered the papers submitted and being fully informed, the Court GRANTS IN PART AND DENIES IN PART both motions and DISMISSES the Second Consolidated Amended Class Action Complaint (the "SAC") WITH LEAVE TO AMEND.[2]

## I. BACKGROUND

### A. Factual Summary and Bases of Claims Asserted in SAC [3]

Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act on behalf of all persons who purchased or acquired Calpine's publicly traded securities, including those persons or entities who purchased Calpine's 8.5% Senior Notes due February 15, 2011 (the "Class"), between January 5, 2001, and May 31, 2002, inclusive (the "Class Period"). (SAC ¶ 1.) The 8.5% Senior Notes were initially issued in the aggregate amount of $1.15 billion in February 2001 (the "February 2001 Tranche") pursuant to a registration statement filed with the Securities Exchange Commission (the "SEC") on December 1, 2000, using a

1. The Second Consolidated Amended Class Action Complaint also names Arthur Andersen LLP ("Andersen") as a defendant. On June 23, 2003, Andersen filed Arthur Andersen LLP's Motion to Dismiss Second Consolidated Amended Class Action Complaint ("Andersen's Motion"), which has not yet been resolved. On August 8, 2003, the Court granted Plaintiffs' motion to dismiss Andersen as a defendant. Accordingly, the Court now DENIES Andersen's Motion as moot.

2. These motions are suitable for disposition without a hearing. See Fed.R.Civ.P. 78; Civ. L.R. 7–1(b).

3. The following factual summary is based primarily on the factual allegations of the SAC. Generally, the facts set out in the summary are stated as if true. However, where Plaintiffs have alleged a legal conclusion (e.g., that an alleged misrepresentation was "material") or an ultimate fact derived from foundational facts alleged elsewhere in the SAC (e.g., that a particular statement was "false and mislead-

ing" in light of the existence of certain other facts), when stating such legal conclusion or ultimate fact, the Court will note that Plaintiffs "allege" or "contend" that conclusion or fact or will note that it is true "according to Plaintiffs." This approach allows the Court to provide in this Order a thorough factual summary while at the same time maintaining the principle that, while the Court generally accepts as true the factual allegations in a complaint when resolving a Rule 12(b)(6) motion, the Court need not accept legal conclusions ostensibly cast in the form of factual allegations or factual allegations unreasonably inferred from other facts. See infra Part II.A.

In addition, since Andersen is no longer a defendant in this action, and the allegations in the SAC regarding Andersen are not relevant to the Court's review of the claims against the remaining defendants, the Court ignores all references to Andersen in the SAC in its presentation of the factual summary and examination of the sufficiency of the claims.

"shelf" registration or continuous offering process (the "Shelf Registration Statement"), and supplemental prospectus filed with the SEC on February 12, 2001 (the "February Supplemental Prospectus"). (*Id.*) On October 15, 2001, Calpine filed another supplemental prospectus (the "October Supplemental Prospectus"), deemed part of the Shelf Registration Statement, issuing an additional $850 million of 8.5% Senior Notes (the "October 2001 Tranche") that were to be "offered as a further issuance of" and to "be fungible with and form a single series" with the 8.5% Senior Notes issued in February 2001, with the same CUSIP number (131347 AW 6) "and were to trade interchangeably with the February 2001 Tranche." (*Id.*) The notes issued pursuant to the February Supplemental Prospectus and the October Supplemental Prospectus will be referred to as the "2011 Notes."

The defendants in this consolidated action are Calpine, a Delaware corporation headquartered in San Jose, California, (*id.* ¶ 25); Peter Cartwright ("Cartwright"), who, at all relevant times, served as Chairman, Chief Executive Officer, President, and Director of Calpine, (*id.* ¶ 26); Ann B. Curtis ("Curtis"), who, at all relevant times, served as Executive Vice President, Chief Financial Officer, Corporate Secretary, and Director of Calpine, and on March 28, 2002, was appointed Vice Chairman of Calpine, (*id.* ¶ 27); E. James Macias ("Macias"), who, at all relevant times, served as Senior Vice President of Power and Industrial Marketing and on April 1, 2002, became Calpine's Chief Operating Officer, (*id.* ¶ 28); Charles B. Clark, Jr. ("Clark"), who, at all relevant times, served as Controller, Chief Accounting Officer, and Senior Vice President of Calpine, (*id.* ¶ 29); and Paul Posoli ("Posoli"), who

served as vice president of risk management beginning in 1999 and in April 2001 was promoted to Senior Vice President of Calpine Energy Services, (*id.* ¶ 30).[4]

The SAC asserts four claims for relief. Count I is brought against all defendants for violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Count II is brought against the Individual Defendants for violation of Section 20(a) of the Exchange Act and is predicated on the alleged violations on which Count I is based. (*See id.* ¶ 267.) Count III is brought against all defendants except Macias and Posoli for violation of Section 11 of the Securities Act. Count IV is brought against the Individual Defendants except Macias and Posoli for violation of Section 15 of the Securities Act and is predicated on the alleged violations on which Count III is based. (*See id.* ¶ 282.) Counts I and II are referred to herein as the "Exchange Act claims"; Counts III and IV, the "Securities Act claims."

### 1. *Calpine's Business and Expansion of Power Generation Capacity*

Calpine is an independent power company engaged in the development, acquisition, ownership, and operation of power generation facilities and the sale of electricity mainly at the wholesale level. (*Id.* ¶ 40.) Calpine is one of the largest developers of power plants in the United States. (*Id.*) Its primary markets are California, Texas, and New England. (*Id.*) By December 31, 2000, Calpine had interests in 50 power generation facilities, mainly gas-fired, throughout the United States having a net capacity of 5,484 megawatts. (*Id.*) Calpine also had under construction 25 power generation facilities having a net

---

4. As noted *supra,* Arthur Andersen LLP has been dismissed from this action as a defendant.

capacity of 14,028 megawatts and had announced plans to develop an additional 28 power plants and expansions. (*Id.*) These facilities were to provide Calpine with an additional net capacity of 15,142 megawatts. (*Id.*) By December 31, 2001, Calpine's generating capacity had grown substantially: Calpine had interests in 64 power generation facilities representing 12,090 megawatts of net capacity; 22 gas-fired plants; and 2 expansion projects under construction to provide additional net capacity of 14,142 megawatts; and 34 projects in "advanced development" to provide further net capacity of 15,100 megawatts. (*Id.*)

In power generation businesses, revenue is derived from a commodity price multiplied by the number of units sold, and profitability is determined by profit margins. (*Id.* ¶ 41.) Calpine's revenue was generated by the aforementioned power generation facilities under long-term power sales agreements. (*Id.* ¶ 42.) Under these agreements, Calpine received energy payments for each kilowatt of energy delivered, as well as payments based on the capacity made available by each plant. (*Id.*)

Electric utility deregulation created new price risks for companies, such as Calpine, that consumed large quantities of power. (*Id.* ¶ 43.) To limit the risk of sudden, dramatic electricity price moves, companies like Calpine employ strategies akin to those used to tame the price volatility of energy commodities (*e.g.*, oil or natural gas). (*Id.*) These companies hedge with private forward contracts, using new exchange-based electricity derivatives, or insurance to keep costs consistent. (*Id.*) A company that hedges simply takes a financial position intended to offset fluctuations in the price of a commodity. (*Id.*) Calpine engaged in "hedging, balancing and optimization" trading activities to hedge the

risks arising from, *inter alia*, its long-term power agreements. (*Id.* ¶ 44.)

During the Class Period, Calpine had 5,489 megawatts of net baseload generation capacity (power generation is divided into baseload, which is continuous operation, and non-baseload, which involves a plant being turned on and off to meet variations in demand). (*Id.* ¶ 46.) Throughout the Class Period, Calpine announced that it intended to operate 70,000 megawatts of net generation by December 31, 2005. (*Id.*)

Calpine expanded its megawatts of net generation through plant development and acquisitions. (*Id.* ¶ 47.) Expansion, however, is very costly, as each megawatt costs approximately $625,000 to develop and build. (*Id.*) In order to finance its growth, Calpine required $2.2 billion of capital per quarter. (*Id.*) Cash flow from Calpine's operations was insufficient to meet Calpine's needs (*e.g.*, cash flow for the eighteen months ended June 30, 2001, was reported to be $412 million, averaging $68.6 million per quarter, or 3.1% of its capital needs). (*Id.*)

Calpine's relatively large capital needs and minimal cash flow rendered Calpine reliant on capital markets for its financing needs. (*Id.* ¶ 48.) In the second quarter of 2001, Calpine raised $3.5 billion in three offerings: (1) Calpine sold $850 million of zero-coupon convertible debentures due 2021 in a private placement; (2) Calpine Canada Energy Finance ULC completed a $1.5 billion offering of 8.52% Senior Notes due 2008; and (3) Calpine priced a public offering of $1.15 billion in principal amount of 8.5% Senior Notes due 2011. (*Id.*)

### 2. The California "Energy Crisis" and California's Negotiations of Energy Contracts with Calpine

On March 31, 1998, California's restructured electricity markets opened. (*Id.* ¶ 81.) For the next two years, the market

operated fairly efficiently, although market power concerns required the Federal Energy Regulatory Commission (the "FERC") to impose price caps in the California Independent System Operator ("ISO") markets. (*Id.*) Accordingly, during these years, energy prices averaged approximately $33/Mwh. (*Id.*) Price caps of $250/Mwh set during most of that period were rarely reached. (*Id.*)

By May 2000, problems appeared, with year-over-year prices 100% higher than in May 1999. (*Id.* ¶ 82.) According to the FERC, in June 2000, prices reached astronomic heights, and remained so for the ensuing year. (*Id.*) These prices were accompanied by declining reliability. (*Id.*) By the end of 2000, the ISO was forced to declare 55 system emergencies, compared to only 11 in 1998 and 1999 combined. (*Id.*)

The crisis did not cease with the arrival of cooler weather in the fall of 2000. (*Id.* ¶ 83.) California-based generation owners withheld their supply from the markets by declaring the power plant units out of service for maintenance and other reasons, or by simply refusing to bid into the spot markets. (*Id.*) Outages persisted at three to four times historical rates throughout the late fall and into the spring of 2001. (*Id.*) Prices continued to rise rather than to decline. (*Id.*)

Against these conditions, the California Department of Water Resources (the "CDWR") found itself in need of energy to keep the lights on in California. (*Id.* ¶ 84.) On January 17, 2001, Governor Gray Davis issued an emergency order giving the CDWR authority to enter into agreements for the purchase of power necessary to mitigate the effects of electrical shortages in the state. (*Id.*) Pursuant to its new authority, the CDWR commenced a power procurement program that was unprecedented in the industry or state-sponsored procurement programs. (*Id.*)

Due to the urgency of the energy crisis, CDWR negotiators failed to attend to the fine details of the contracts into which they were entering, such as those with Calpine. (*Id.* ¶ 85.) As one CDWR staff member noted, in negotiating the contracts, the agency operated pursuant to one overwhelming interest—to keep the lights on in California. (*Id.*) This staff member's notes made of a conversation with negotiators stated: "In negotiating contracts/agreements, everyone needs to realize that perfection may destroy and make processes unmanageable. Our focus should be to come out of this 'hole' as soon as possible." (*Id.*) At the time Calpine and, in particular, defendant Macias commenced negotiations with the CDWR, the energy crisis was at its peak. (*Id.* ¶ 86.) Thus, when soliciting bids for power contracts, the CDWR did not request contract terms and conditions that are standard in the power industry for entities that must ensure reliable power delivery. (*Id.*)

On or about February 6, 2001, just days prior to the 2011 Note offering, Calpine signed a $4.6 billion contract with the CDWR to provide affordable-priced electricity to the state of California. (*Id.* ¶ 87.) Pursuant to the agreement, Calpine committed to sell up to 1,000 megawatts of clean, affordable-priced electricity from its portfolio of new and existing energy centers. (*Id.*) Initial deliveries were to commence on October 1, 2001, with 200 megawatts and build to 1,000 megawatts by January 1, 2004. (*Id.*)

On or about February 26, 2001, Calpine signed two additional long-term power sales contracts with the CDWR, totaling $8.3 billion. (*Id.* ¶ 88.) Under the terms of the $5.2 billion, 10–year, fixed-price contract, Calpine committed to sell up to 1,000 megawatts of competitively priced generation from its portfolio of new energy centers. (*Id.*) Initial deliveries under this

contract were scheduled to commence on July 1, 2001, with 200 megawatts of capacity; by as early as July 2002, Calpine expected the amount to increase to 1,000 megawatts and continue through 2011. (*Id.*) In the other contract—a 20-year contract, totaling up to $3.1 billion—Calpine agreed to supply the CDWR with up to 495 megawatts of peaking generation, beginning with 90 megawatts as early as August 2001 and increasing to 495 megawatts by as early as August 2002. (*Id.* ¶ 89.) Calpine agreed to supply peaking capacity, with the option to purchase up to 2,000 hours of energy during certain peak periods from 11 new generating units. (*Id.*)

Each of the CDWR contracts required California to take power during periods of low demand. (*Id.* ¶ 90.) One of the CDWR contracts also provided that Calpine could obtain $80 million to $90 million per year of "capacity payments" even if Calpine was unable to provide any capacity during all but one of the twenty years of the contracts. (*Id.* ¶ 91.) Thus, under these terms, Calpine could have withheld power or redistributed it elsewhere, during years two through twenty, and Calpine would still receive $90 million in years two through five and $80 million in years six through twenty. (*Id.*) The CDWR contracts further deprived the state of virtually any remedy in the event of Calpine's default, while giving to Calpine the right to an additional $1.8 billion in the event of California's default. (*Id.* ¶ 92.) The CDWR contracts contained other unprecedented terms in the energy industry, terms that significantly disadvantaged California and provided potential windfalls to Calpine. (*Id.* ¶ 93.)

### 3. *Governmental Investigations and Legal Proceedings Relating to Energy Crisis*

In August 2001, the California State Auditor commenced an audit of Calpine's contracts with the CDWR. (*Id.* ¶ 94.) Prior to the completion of the audit, the FERC issued an order indicating that the CDWR contracts may have violated federal law. (*Id.*) On November 27, 2001, the FERC issued an order finding that the "dysfunction" in the short-term energy market in California in 2000 and 2001 may have impacted long-term power contract prices rendering them unjust and unreasonable under Sections 205 and 206 of the Federal Power Act (the "FPA"). (*Id.*) Sections 205 and 206 of the FPA, 16 U.S.C. §§ 824d, 824e, mandate that all rates and charges be "just and reasonable." (*Id.* ¶ 95.) All sales or transmissions that are not just and reasonable are unlawful and subject to refund. (*Id.*)

The FERC order prompted further investigation by western states into overcharges for power by companies such as Calpine. (*Id.* ¶ 96.) Legal action against Calpine was commenced by Nevada Power Company and Sierra Pacific Power Company, both of whom had entered into long-term power contracts with Calpine during the same time frame in which the CDWR contracts were entered into, alleging that the rates and terms violated the FPA. (*Id.*)

On December 20, 2001, the California State Auditor issued its report, a separate detailed critique of the terms of the CDWR contracts. (*Id.* ¶ 98.) The State Auditor found that the CDWR contracts, entered into during the first five weeks after the CDWR was given its authority, were wholly inadequate for the intended goal—to provide a reliable source of power at the lowest possible cost as a means of addressing the Energy Crisis—set forth by the California legislature. (*Id.*) The CDWR had entered into approximately 40 contracts valued at $35.9 billion in just 30 days, which precluded the planning and analysis necessary for developing a portfolio of this size. (*Id.*) The report stated in part:

Various factors hampered the department's efforts in its new role. Specifically, the department initially had to purchase much of this power each day in a dysfunctional market from market-savvy sellers. The department's challenge became especially difficult because it lacked the infrastructure and the experienced, skilled staff needed to perform at this level.

(*Id.*) As a result, the CDWR failed to request even the most fundamental industry-standard contract terms and conditions to assure reliable power delivery. (*Id.* ¶ 99.)

Calpine ultimately agreed to settle all 206 complaints the state had filed with the FERC against Calpine. (*Id.* ¶ 100.)[5] Under the settlement, the Attorney General agreed to drop allegations that Calpine charged illegal prices during California's energy crisis. (*Id.*) In return for this release, Calpine agreed to pay $6 million to fund, in part, a project to retrofit public facilities with solar power. (*Id.*)

On February 25, 2002, the California Public Utilities Commission (the "CPUC") commenced an action with the FERC against Calpine alleging violations of the FPA and certain rules, regulations, and orders promulgated thereunder. (*Id.* ¶ 101.) The CPUC requested the initiation of refund proceedings pursuant to Section 205 of the FPA. (*Id.*) The complaint specifically referenced the three CDWR contracts. (*Id.*)

On April 22, 2002, Calpine announced that it had restructured its CDWR con-

tracts. (*Id.* ¶ 103.) Calpine agreed to reduce the value of those contracts by $4.3 billion by, *inter alia*, significantly reducing the terms and prices of these contracts. (*Id.*) Calpine also agreed to reduce the energy price on one ten-year baseload contract from $61.00 to $59.60 per megawatt-hour and convert the energy portion of its peaker contract to gas index pricing from fixed energy pricing. (*Id.*) Calpine further agreed to deliver up to 12.2 million megawatt-hours of additional energy in 2002 and 2003. (*Id.*) On April 24, 2002, the CPUC and the California Energy Oversight Board agreed to drop their FERC complaints against Calpine, in return for which Calpine agreed to restructure four CDWR contracts. (*Id.* ¶ 104.)

### 4. Alleged Misrepresentations and Omissions in Prospectuses Underlying Both Securities Act and Exchange Act Claims [6]

As noted above, Calpine issued the 2011 Notes pursuant to the February Supplemental Prospectus and the October Supplemental Prospectus. (*Id.* ¶ 132.) The February Supplemental Prospectus and the October Supplemental Prospectus were deemed to be part of the Shelf Registration Statement, which was signed by defendants Curtis, Cartwright, and Clark. (*Id.* ¶ 133.)

Plaintiffs allege that the February Supplemental Prospectus and the October Supplemental Prospectus contained untrue statements of material fact and omitted to

---

5. Plaintiffs allege that Calpine agreed to this settlement "[a]t the same time these new agreements were announced ...." (*Id.*) It is not clear, however, to what the phrase "these new agreements" refers.

6. The alleged facts in this section are taken from paragraphs 132 through 139 of the SAC (and the paragraphs they reference), which fall under the heading "SUBSTANTIVE AL-

LEGATIONS—SECURITIES ACT CLAIMS." Although this heading refers to the Securities Act claims alone, Plaintiffs purport to base their Exchange Act claims in part on the allegations in paragraphs 132 through 139, as well as others. (SAC ¶¶ 253, 264.) Accordingly, the allegations in paragraphs 132 through 139 provide not only the basis for Plaintiffs' Securities Act claims, but also a basis for Plaintiffs' Exchange Act claims.

state material facts required to be stated to make the statements not misleading. (*Id.* ¶ 134.) These alleged statements and omissions are described immediately below.

### a. *Discussion of "Factors" Contributing to Increase in Wholesale Energy Prices in Both Prospectuses*

Both prospectuses included a discussion concerning the shortage in power supply affecting California during the prior year. (*Id.*) In this regard, the prospectuses represented that a series of factors reduced the supply of power to California and that this reduction in supply resulted in wholesale prices that were significantly higher than historical levels. (*Id.*) These factors were represented as including: (1) "significantly increased volatility in prices and supplies of natural gas"; (2) "an unusually dry fall and winter in the Pacific Northwest, which reduced the amount of available hydroelectric power from that region"; (3) "the large number of power generating facilities in California nearing the end of their useful lives, resulting in increased downtime"; and "continued obstacles to new power plant construction in California, which deprived the market of new power sources that could have, in part, ameliorated the adverse effects of the foregoing factors." (*Id.*)

Plaintiffs allege that the statements concerning the "factors" that contributed to the increase in wholesale energy prices were materially false and misleading. (*Id.* ¶ 135.) They allege that the shortage in power supply was not caused by any of the reasons identified in the prospectus, but instead was attributable to power companies' withholding capacity to drive up power prices. (*Id.*) Specifically, "ISO monthly data"[7] demonstrated that, in 2000 and 2001, demand did not exceed capacity during the energy crisis and did not exceed prior year demand. (*Id.* ¶ 106.)[8] In addition, energy consultant Robert McCullough, in his testimony before the United States Senate on April 11, 2002, stated that the Western Systems Coordinating Council (the "WSCC") found, based on California ISO data, that there was no supply shortage in 2000 and 2001; California plants were operating during the crisis, but power was not being dispatched. (*Id.* ¶ 107.) Further, data in a report issued by the WSCC entitled "Ten Year Coordinated Plan Summary" suggested that new power plants were not needed during the energy crisis as there was no shortage of supply even assuming drought conditions (which did not exist during 2000, when most of the energy crisis transpired) in the Pacific Northwest. (*Id.* ¶ 108.) Other publicly available governmental and private studies of California plant and market operations and the California energy crisis assert that the energy crisis stemmed from the power providers' withholding of power. (*Id.* ¶¶ 109–13.) Accordingly, Plaintiffs allege that the statements concerning the "factors" contributing to the increase in wholesale energy prices in the prospectuses were materially false and misleading. (*Id.* ¶ 135.)

### b. *Statements Regarding CDWR Contract Announced in February Supplemental Prospectus*

In its "Recent Developments" section, the February Supplemental Prospectus announced the signing of the 10–year, $4.6 billion fixed-price contract with the CDWR. (*Id.* ¶ 136.) Plaintiffs allege that the statements in this announcement were

---

7. Plaintiffs allege that through the Class Period, "ISO data" was readily known and available to power providers like Calpine. (*Id.* ¶ 105.)

8. Paragraph 135 of the SAC references the allegations in paragraphs 106 through 114. (*Id.* ¶ 135.)

materially false and misleading because the terms of this contract were unjust and unreasonable and subject to abrogation or reformation by the FERC for violation of the FPA for the reasons discussed *supra* in Parts I.A.2–3. (*Id.* ¶ 137 (referencing paragraphs 87 and 91–105).) [9] Plaintiffs point out that on April 22, 2002, the contract was reduced to a term of eight years from ten years and revalued at $3.7 billion, an approximately $900 million reduction. (*Id.*)

### c. Statements Regarding CDWR Contract Announced in October Supplemental Prospectus

In its "Recent Developments" section, the October Supplemental Prospectus announced the signing of the two long-term contracts with the CDWR valued at $8.3 billion. (*Id.* ¶ 138.) Plaintiffs allege that the statements in this announcement were materially false and misleading because the terms of this contract were unjust and unreasonable and subject to abrogation or reformation by the FERC for violation of the FPA for the reasons discussed *supra* in Parts I.A.2–3. (*Id.* ¶ 139 (referencing paragraphs 87 and 91–105).) Plaintiffs note that the PUC subsequently renegotiated these contracts, thereby reducing Calpine's expected revenue by approximately 41%, from $8.3 billion to $4.9 billion. (*Id.*)

### 5. Alleged Misrepresentations and Omissions Underlying Exchange Act Claims Only [10]

### a. January 5, 2001 Press Release and ABN–Amro Report

On January 5, 2001, Calpine issued a press release concerning its earnings ex-

pectations for 2000 and 2001. (*Id.* ¶ 140.) These earnings estimates beat analyst expectations, and Calpine's common stock shares rose after their release. (*Id.*) In a conference call discussing Calpine's reported earnings, defendant Cartwright stated, among other things, "Calpine's position is extremely strong and the demand for electricity is up." (*Id.*) Based on this press release, on January 8, 2001, analysts at ABN–Amro issued a report raising their 2000 and 2001 EPS estimates for Calpine's stock. (*Id.* ¶ 141.)

Plaintiffs allege that the statements in the press release, Cartwright's statement in the conference call, and the statements in ABN–Amro's report were materially false and misleading for a number of reasons. (*Id.* ¶ 142.) Plaintiffs allege that defendants knew or recklessly disregarded that the earnings figures discussed would be achieved only through "accounting machinations." (*Id.*) They point to Calpine's capitalization of interest on debt at a rate higher than the rate it used to expense debt, shifting interest expense from the income statement to the balance sheet. (*Id.*) Although Plaintiffs allege that this practice was "improper[ ]," they do not allege that it violated any law or accounting standard. (*See id.* (referencing ¶¶ 51 and 52).)

Plaintiffs also allege that defendants knew or recklessly disregarded that these expected returns were predicated on manipulative transactions between Calpine and Enron. (*Id.* ¶ 143.) Plaintiffs invoke an article appearing in the New York Times on December 9, 2001 (the "December 9 Article"), that allegedly stated that Calpine entered into an agreement with

---

**9.** The SAC does not allege that these statements were materially false and misleading *when made.* (*Id.*)

**10.** The alleged facts in this section are taken from paragraphs 140 through 243 of the SAC (and the paragraphs they reference), which fall under the heading "SUBSTANTIVE ALLEGATIONS—EXCHANGE ACT CLAIMS."

Enron in January 2001 to swap energy capacity and that these "swaps" were used to artificially inflate revenues. (*Id.* (referencing ¶¶ 74 through 76); *id.* ¶ 73.) Plaintiffs contend that the sole purpose of artificially inflating revenues was to meet earnings expectations. (*See id.* ¶ 143.)

Finally, Plaintiffs allege that Cartwright's statement that "Calpine's position is extremely strong and demand for electricity is up" was materially false and misleading for two reasons. (*Id.* ¶ 144.) First, Plaintiffs contend, Cartwright knew or recklessly disregarded that the strength of Calpine was deteriorating and that the only way to conceal the weakness was through accounting machinations. (*Id.*) Second, Plaintiffs contend, demand for electricity was not then increasing. (*Id.*)

### b. *February 6, 2001 Press Release*

On February 6, 2001, Calpine announced its financial and operating results for the fourth quarter and year ended December 31, 2000. (*Id.* ¶ 144.) In the press release, Calpine described "strong" financial and operating results, providing pertinent figures. (*Id.*) Commenting on the reported results, Cartwright stated: "2000 was another outstanding year for Calpine. The execution of our successful growth strategy continues to deliver strong earnings growth and generate exceptional shareholder value." (*Id.* ¶ 145.)

Plaintiffs allege that the statements in the February 6, 2001 press release concerning Calpine's "strong" financial results, particularly reported earnings, were materially false and misleading. (*Id.* ¶ 146.)

Plaintiffs allege that defendants knew or recklessly disregarded that fourth quarter and year-end earnings were inflated due to Calpine's over-capitalization of interest on debt. (*Id.*) Plaintiffs further allege that defendant knew or recklessly disregarded that reported EBITDA (earnings before interest, taxes, depreciation, and amortization) was materially false and misleading because the calculation used to reach the figure did not comply with Generally Accepted Accounting Principles ("GAAP") and was not appropriately labeled so as to inform investors of its variance with GAAP. (*Id.*)[11] Plaintiffs also allege that defendants knew or recklessly disregarded that the reported earnings figures were materially false and misleading because they were the result of defendants' failure to adhere to FAS 133, a set of accounting principles that are allegedly premised on the proposition that, for traded contracts, the value reflected should be the fair value based on market prices. (*Id.* ¶¶ 54–55, 146.) Finally, Plaintiffs allege that Cartwright's statement in the press release was materially false and misleading because the reported earnings figures were produced through manipulating accounting rules and procedures. (*Id.* ¶ 146.)[12]

On February 6, 2001, in reliance on the truth and accuracy of Calpine's February 6, 2001 press release and other prior public statements, Salomon Smith Barney issued a research report reiterating its "Strong Buy" rating and $60 price target on Calpine stock. (*Id.* ¶ 147.) Plaintiffs allege that statements in this report regarding Calpine's financial results were

---

**11.** Although Plaintiffs emphasize that the reported EBITDA figure did not comply with GAAP, the SAC alleges elsewhere that EBITDA is a non-GAAP figure, (*see id.* ¶ 65); thus, it would appear both unremarkable and expected that the reported EBITDA figure did not comply with GAAP.

**12.** There appears to be a line missing in paragraph 146, which runs from page 47 to page 48 of the SAC and states in pertinent part: "Cartwright knew that Calpine's growth strategy was dependent upon its relationship with Enron [...] the Energy Crisis, and the soon to be announced $4.6 billion 10 year contract with the CDWR." (*Id.* ¶ 146.)

materially false and misleading in that Calpine's earnings were the result of defendants' manipulative accounting techniques rather than a representation of its true financial state. (*Id.*)

### c. *February 7, 2001 Press Release*

On February 7, 2001, Calpine announced the $4.6 billion contract with the CDWR in a press release. (*Id.* ¶ 148.) Macias was quoted in the press release as stating, "Calpine is very pleased to provide California consumers with a vital new source of clean and affordable electricity. This contract between Calpine and the State brings competitively priced power to the market to help stabilize electricity prices for consumers." (*Id.*)

Plaintiffs allege that the statements in the press release concerning Calpine's bringing "competitively priced power to the market" and "affordable electricity" to California consumers were materially false and misleading. (*Id.* ¶ 150.) Plaintiffs allege that, as Macias was the lead negotiator of and signatory to the contract, Macias knew or recklessly disregarded that the terms of the contract were unjust and unreasonable and subject to abrogation or reformation by the FERC for violation of the FPA for the reasons stated *supra* in Parts I.A.2–3. (*Id.*)

### d. *February 28, 2001 Press Release*

On February 28, 2001, Calpine issued a press release announcing the signing of the two long-term power contracts with the CDWR. (*Id.* ¶ 155.) The press release stated, *inter alia,* that under the terms of the $5.2 billion, 10–year, fixed-price contract, Calpine committed to sell up to 1,000 megawatts of "competitively priced" power. (*Id.*) The press release also quoted Macias as commenting in part, "This is another win-win for California consumers and Calpine.... Calpine will soon be providing up to 2,500 megawatts of clean, reliable and affordable energy." (*Id.*)

Plaintiffs allege that the statement in the February 28, 2001 press release concerning Calpine's providing California with "competitively priced" power and Macias' statements that the contracts would provide California with "affordable electricity" and presented California consumers and Calpine with a "win-win" situation were materially false and misleading. (*Id.* at ¶ 156.) Plaintiffs allege that defendants knew or recklessly disregarded that the terms of these contracts were unjust and unreasonable for the reasons stated *supra* in Parts I.A.2–3 and benefitted Calpine solely. (*Id.*)

### e. *Calpine's 2000 Form 10–K and Accompanying Annual Report*

On March 15, 2001, Calpine filed with the SEC its 2000 10–K. (*Id.* ¶ 159.) Defendants Cartwright, Curtis, and Clark, among others, signed the 2000 10–K. (*Id.*) According to the 2000 10–K, Calpine's financial statements and methods of accounting were accurate and prepared in conformity with GAAP. (*Id.*) The 2000 10–K also discussed, among other things, certain financial market risks that Calpine faced and the definition of EBITDA used in the 10–K. (*Id.*)

Plaintiffs allege that Calpine's financial statements in the 2000 10–K were materially false and misleading and did not, as defendants knew or recklessly disregarded, comply with GAAP in all material respects. (*Id.* ¶ 160.) Plaintiffs allege that the statements concerning the accounting for financial swaps were materially false and misleading. (*Id.*) They allege that defendant knowingly and recklessly failed to consistently account for hedges in each successive filing and did not always designate hedges as cash flow hedges. (*Id.*)

Plaintiffs further allege that the statement concerning the definition of reported EBITDA was materially false and mis-

leading because it failed to explain that Calpine's calculation of EBITDA did not conform to GAAP. (*Id.*) They allege that defendants knew or recklessly disregarded that Calpine's presentation of EBITDA did not comply with recent SEC guidance concerning the disclosure of non-GAAP measures such as EBITDA. (*Id.*)

Within the annual report to shareholders, which accompanied the 2000 10–K, defendant Cartwright made a number of statements in his Letter to Shareholders concerning the energy crisis and the demand for energy. (*Id.* ¶ 161.) Cartwright stated, *inter alia:* "Events in California and its markets across the country validate Calpine's version of the increased opportunities to the power industry. Demand is exceeding supply." (*Id.*) Plaintiffs allege that Cartwright's statements concerning the events in California in 2000 and early 2001 and the demand for electricity were materially false and misleading. (*Id.* ¶ 162.) Plaintiffs allege that, "based on contemporaneous government reports available to defendants," Cartwright knew or recklessly disregarded that neither a shortage of capacity nor an increase in demand drove increases in power prices. (*Id.*)

**f. *March 29, 2001 Press Release***

On March 29, 2001, Calpine issued a press release entitled "Calpine Anticipates Higher Financial Results for 2001." (*Id.* ¶ 163.) Calpine stated that it expected net income for the year ending December 31, 2001, to exceed that of the previous year and to exceed previous expectations. (*Id.*) The press release also quoted Cartwright as stating in part: "This increase reflects Calpine's accelerated growth in the U.S. power industry . . . . [W]e are looking forward to another strong year for Calpine." (*Id.*)

Plaintiffs allege that the statement in the press release concerning increased earnings was materially false and misleading. (*Id.* ¶ 165.) Plaintiffs allege that defendants knew or recklessly disregarded that their earnings estimates would not be achievable but for the manipulation of accounting rules and regulations. (*Id.*) Plaintiffs further allege that Cartwright's statement concerning the increase in expected earnings as being reflective of Calpine's growth in the U.S. power industry was knowingly or recklessly false and misleading for the same reasons. (*Id.*) Plaintiffs additionally allege that Cartwright knew or recklessly disregarded that some of the purported growth was the result of the contracts with the CDWR, contracts that were unjust and unreasonable under the FPA for the reasons stated *supra* in Parts I.A.2–3. (*Id.*)

**g. *April 26, 2001 Earnings Release***

On April 26, 2001, Calpine announced its financial results for the quarter ended March 31, 2001. (*Id.* ¶ 166.) The statement provided EBITDA figures showing an increase relative to the prior year. (*Id.*) In a footnote to the consolidated condensed statement of operations for the first three months of the year, defendants stated that the reported EBITDA figure represented a "non-GAAP measure" and provided a definition for that measure illustrating how it was calculated. (*Id.*) Defendants also mentioned the three long-term power sales agreements with the CDWR, stating that they provided "needed sources of clean, competitively priced electricity for its customers." (*Id.*)

Plaintiffs allege that the statement concerning reported earnings was materially false and misleading because defendants knowingly or recklessly inflated the value of Calpine's long-term energy contracts and misapplied FAS 133. (*Id.* ¶ 168.) Plaintiffs further allege that the statements concerning the definition of EBIT-

DA were materially misleading because "an examination of the footnote's dense prose revealed that certain expenses had been added back" to the reported EBITDA figure, "artificially inflating the figure." (*Id.* ¶ 169.) Plaintiffs allege that defendants failed to comply with an SEC directive (discussed *infra* in Part I.A.6) either to remove all reconciling items or to retitle EBITDA as "EBITDA, as adjusted," which would have informed investors that Calpine's reported EBITDA did not conform to GAAP. (*Id.*) Finally, Plaintiffs allege that the statements concerning the CDWR contracts were materially false and misleading because defendants knew or recklessly disregarded that they would not provide California with competitively priced power and that they were unjust and unreasonable in violation of the FPA. (*Id.* ¶ 170.)

### h. *Cartwright's June 11, 2001* Wall Street Transcript *Statement*

On June 11, 2001, the *Wall Street Transcript* conducted an interview with Cartwright in which he stated, in pertinent part: "We are comfortable that we are going to continue to have very healthy margins." (*Id.* ¶ 174.) Plaintiffs allege that Cartwright's statement concerning Calpine's continued "healthy margins" was materially false and misleading because Cartwright knew or recklessly disregarded that Calpine's financial statements were not truly representative of its financial status but, rather, were the result of manipulative accounting practices. (*Id.* ¶ 175.)

### i. *July 26, 2001 Second Quarter 2001 Report*

On July 26, 2001, Calpine announced its financial results for the three and six months ended June 30, 2001. (*Id.* ¶ 176.) The announcement, *inter alia*, provided EBITDA figures, along with the definition mentioned *supra* in Part I.A.5.g. (*Id.* ¶¶ 177, 179.) The announcement also quoted Cartwright as commenting on the reported results in pertinent part as follows: "It was a great quarter for Calpine .... Our unique systems approach enables Calpine to better serve our customers, secure strong long- and short-term contracts, lower costs and maximize value.... Calpine's outlook remains strong.... Calpine expects continued strong financial results through the balance of 2001 and beyond, with 2001 year-end earnings from recurring operations to be approximately $2.00 per share." (*Id.* ¶ 178.)

Plaintiffs allege that the statement concerning reported earnings was materially false and misleading because defendants knowingly or recklessly inflated the value of Calpine's long-term energy contracts, misapplied FAS 133, and misused the pooling of interest method of accounting. (*Id.* ¶ 180.) Plaintiffs also allege that the statements concerning the definition of EBITDA were misleading for the reasons identified *supra* in Part I.A.5.g. (*Id.* ¶ 181.)

Plaintiffs further allege that statements by Cartwright in particular were materially false and misleading in several respects. (*Id.* ¶ 182.) They allege that Cartwright knew or recklessly disregarded that Calpine's financial statements were not representative of Calpine's financial status but were the result of manipulative accounting practices. (*Id.*) They allege that Cartwright's statements about serving its customers were materially misleading because Calpine's long-term contracts were unreasonable and unjust and would not provide customers with lower costs for their energy. (*Id.*) Finally, Plaintiffs allege that given the accounting machinations used by defendants to meet earnings estimates, Cartwright lacked any basis in fact to represent that Calpine's outlook remained "strong" and that Calpine expected "strong" future financial results. (*Id.*)

**j.** *July 27, 2001* **Contra Costa Times Article**

On July 27, 2001, the *Contra Costa Times* published an article in which Cartwright was quoted as stating that, because of the high prices it had locked in, Calpine expected its full-year operating income to exceed Calpine's previous prediction of $1.90 per share. (*Id.* ¶ 186.) He added that he was "very confident" that Calpine's earnings would exceed $2 per share in 2001. (*Id.*)

Plaintiffs allege that Cartwright's statements in this article were materially false and misleading when made because the prices "locked in" were unjust and unreasonable in violation of the FPA and thus subject to abrogation or reformation by the FERC. (*Id.* ¶ 187.) Plaintiffs allege that Cartwright had no basis on which to be "very confident" that Calpine's income would exceed $2 per share in 2001. (*Id.*)

**k.** *Second Quarter 2001 10–Q*

On August 14, 2001, Calpine filed with the SEC its Second Quarter 2001 10–Q. (*Id.* ¶ 188.) Defendants Curtis and Clark signed the 10–Q, which stated, among other things, that Calpine's financial statements complied with GAAP. (*Id.*) In the 2001 Second Quarter 10–Q, Calpine recognized $94.6 million of commodity derivative mark-to-market gains on its income statement. (*Id.*) Calpine reported commodity derivative comprehensive income (excluding mark-to-market income) of $176.9 million. (*Id.*)

Plaintiffs allege that defendants' statements in the Second Quarter 2001 10–Q were materially false and misleading "for the reasons stated in paragraphs 51–81" of the SAC. (*Id.* ¶ 189.) [13] Plaintiffs further allege that "virtually all of [Calpine's] commodity derivatives should have been designated as cash flow hedges." (*Id.*) According to Plaintiffs, this designation of cash flow hedges was made in the first quarter of 2001 but not in the second quarter, "thus leading to an inconsistent application of accounting principles, and rendering defendants' statements concerning earnings false and misleading." (*Id.*)

The Second Quarter 2001 10–Q also contained statements purporting to give the causes of the California energy crisis. (*Id.* ¶ 190.) Plaintiffs allege that these statements were materially false and misleading for the reasons discussed *supra* in Part I.A.4.a. (*Id.*)

**l.** *August 28, 2001 Conference Call with Analysts*

During an August 28, 2001 conference call with analysts (in which Cartwright, Curtis, Posoli, and Macias participated), Calpine officials said that there were no discussions underway to renegotiate the long-term contracts with the CDWR. (*Id.* ¶ 191.) Plaintiffs allege that these statements were materially false and misleading because Calpine knew, at the time such statements were made, that the CDWR contracts were unjust and unreasonable and, consequently, subject to abrogation or reformation by the FERC for violations of the FPA. (*Id.* ¶ 192.)

**m.** *October 2, 2001 Press Release Announcing Debt Upgrade*

On October 2, 2001, Calpine announced that its corporate credit and senior unsecured notes had been upgraded by Moody's Investor Service. (*Id.* ¶ 193.)

---

**13.** Paragraphs 51 through 81 allege improper accounting practices on the part of Calpine consisting of alleged overcapitalization of interest on debt, inconsistent application of FAS 133, the provision of EBITDA figures "not computed in accordance with GAAP," improper use of pooling of interest method of accounting, and engaging in "swap trades" and "wash trades." (*Id.* ¶¶ 51–81.)

The press release commented that the upgrade "reflect[ed] the company's strong operating portfolio of efficient and low-cost power facilities and solid cash flow positions over the next five years." (*Id.*)

Plaintiffs allege that the statement regarding the reasons for the upgrade was materially misleading because defendants knew or recklessly disregarded that Calpine's operating portfolio figures and cash flow positions were derived through manipulative accounting. (*Id.* ¶ 194.) Plaintiffs allege that defendants deliberately made false financial projections to insure that Calpine's credit ratings would continually be upgraded, thus insuring that future financings would be easily obtained and less costly. (*Id.*)

### n. October 25, 2001 Press Release

On October 25, 2001, Calpine announced its earnings for the three and nine months ended September 30, 2001. (*Id.* ¶ 195.) The press release provided essentially the same types of financial figures as those provided in the July 26, 2001 Second Quarter report, including EBITDA figures. (*See id.* ¶¶ 195–96; *compare id.* ¶¶ 195–96 *with id.* ¶¶ 176–77.) In the press release, Cartwright stated, *inter alia,* that the third quarter of 2001 was "another record quarter"; that Calpine's "new energy resources will go a long way to help meet increased demand"; and that Calpine's future outlook remained "strong." (*Id.* ¶ 197.) Plaintiffs allege that the various statements in the press release were materially false and misleading when made for the same reasons identified *supra* in Parts I.A.5.g and I.A.5.i, as well as for the reason that demand for power was in fact not increasing. (*See id.* ¶¶ 198–200.)

### o. Third Quarter 2001 10–Q

On November 14, 2001, Calpine filed with the SEC its quarterly report on Form 10–Q for the quarter ending September 30, 2001. (*Id* ¶ 203.) Defendants Curtis and

Clark signed the 10–Q, which stated, among other things, that Calpine's financial statements complied with GAAP. (*Id.*) The Third Quarter 2001 10–Q contained a discussion regarding the California energy crisis and the causes therefor. (*Id.*)

Plaintiffs allege that the statement that Calpine's financials were prepared in accordance with GAAP was materially false and misleading because, as defendants knew, in an effort to meet its earnings expectations, Calpine engaged in a variety of improper accounting procedures that did not comply with GAAP. (*Id.* ¶ 204.) Plaintiffs further allege that the statements concerning the energy crisis were materially false and misleading for the reasons identified *supra* in Part I.A.4.a. (*Id.*)

### 6. Drop in Calpine Stock Price and Credit Rating

On November 14, 2001, the price of Calpine stock traded between $26.90 per share and $28.85 per share. (*Id.* ¶ 205.) On or about November 27, 2001, the FERC issued the aforementioned order finding that the "dysfunction" in the short-term energy market in California in 2000 and 2001 may have impacted long-term power contract prices, rendering them unjust and unreasonable under Sections 205 and 206 of the FPA. (*Id.* ¶ 206.) On the same day, the FERC also instituted a proceeding under the FPA to investigate the justness and reasonableness of the price of power charged to California by power companies, including Calpine. (*Id.*) On this news, Calpine's stock price dropped from $23.29 per share on November 27, 2001, to $21.10 per share on November 28, 2001. (*Id.* ¶ 207.)

On December 9, 2001, the *New York Times* published the December 9 Article, described *supra*, which discussed Calpine's financial statements and its dealings with Enron. (*Id.* ¶ 209.) As to the former, the

article described Calpine's financial statements as "opaque" and "so complex as to be almost unfathomable." (*Id.*) The article further described Calpine's practice of recording on its balance sheets hedging activity that produced losses while recording all hedges that produced gains on its income statement. (*Id.*) As to the latter, the article discussed Calpine's increased reliance on Enron as a trading partner through 2001. (*Id.*) Further, the December 9 Article noted that, in many respects, Calpine's balance sheet was as complex and incomprehensible as Enron's. (*Id.* ¶ 210.) In response to publication of the December 9, 2001 Article, the price of Calpine's common stock fell 17% from its Friday, December 7, 2001, close of $21.37 per share to $17.79 per share on Monday, December 10, 2001. (*Id.* ¶ 211.)

On December 11, 2001, Calpine announced that it had scheduled a meeting with California officials for later that week to discuss the terms of the CDWR contracts. (*Id.* ¶ 212.) On December 11, 2001, Calpine's common stock price closed at $15.50 per share. (*Id.* ¶ 213.)

On December 13, 2001, the *New York Times* published an article entitled "Calpine's Accounting Ways Have Been Issue With S.E.C." (the "December 13 Article") concerning Calpine's correspondence with the SEC and Calpine's continued failure to rectify its reported EBITDA in its public filings. (*Id.* ¶ 214.) The article stated in pertinent part that in an April 19 letter to Clark, the assistant director of corporation finance at the SEC complained that Calpine's version of EBITDA included terms added to or taken away from earnings that were not normally part of EBITDA. (*Id.*) The article quoted the letter as instructing Calpine to, at a minimum, retitle the non-GAAP measure as "ebitda, as adjusted." (*Id.*) The article stated that Calpine responded to the SEC in a letter dated May 7, 2001, that affirmed that Calpine would henceforth label the measure at issue as "ebitda, as adjusted." (*Id.*)

On December 14, 2001, Lehman Brothers downgraded Calpine to "Market Perform" from "Strong Buy" due to "increasing liquidity concerns and an uncertain earnings outlook." (*Id.* ¶ 218.) Also on December 14, 2001, prior to the opening of the market, Moody's Investors Service announced that it might cut the credit rating on Calpine's $11.6 billion of debt to junk. (*Id.* ¶ 219.) Calpine shares fell from a closing price of $16.05 per share on December 13, 2001, to a closing price of $13.20 per share on December 14, 2001. (*Id.* ¶ 217.) Following the close of the market on December 14, 2001, Moody's Investor Service announced that it had cut its rating of Calpine's debt to junk. (*Id.* ¶ 220.)

On December 20, 2001, the California State Auditor issued a report in which it determined that the CDWR was overcharged on long-term power contracts. (*Id.* ¶ 221.) On February 13, 2002, the *Dow Jones Newswire* reported that Calpine had amended its Third Quarter 2001 10–Q to reflect losses sustained on cash flow hedges. (*Id.* ¶ 222.) On February 14, 2002, the *San Francisco Chronicle* published an article that also discussed the amended filing. (*Id.* ¶ 223.)

On May 31, 2002, Calpine issued a press release in response to the FERC investigation of power trading activities. (*Id.* ¶ 224.) Calpine admitted that it did engage in the trading activities, specifically "wash trades" and "round-trip trades." (*Id.*) With regard to its "wash trade" trading practices, Calpine stated in part: "Of more than 72,000 transactions, 31 resulted in the simultaneous purchase and sale of the same electricity product between the same counterparties. These transactions were completed for risk management reasons, and represented approximately one-tenth

o[f] one percent of 2001 total revenue. There were no such transactions in 2000." (*Id.*) Calpine's common stock fell 12% that day, to $8.48 per share. (*Id.* ¶ 225.)

### 7. Individual Defendants' Stock Sales

During the Class Period, commencing on February 22, 2001, and ending on February 6, 2002, Cartwright sold a total of 403,000 shares of Calpine stock, for proceeds totaling $15,621,007. (*Id.* ¶ 233.) Commencing on February 22, 2001, and ending on November 14, 2001, Curtis sold a total of 270,000 shares of Calpine stock, for proceeds totaling $13,567,400. (*Id.*)

### 8. Defendants' Alleged Motives and Opportunities

Plaintiffs allege that the Individual Defendants were motivated to inflate the stock price and financial results of Calpine to maximize their executive compensation packages. (*Id.* ¶¶ 234–36.) Plaintiffs further allege that defendants were motivated to inflate the stock price and financial results of Calpine to ensure Calpine's continued access to capital markets. (*Id.* ¶ 237.) In addition, defendants knew that without a continual capital infusion, Calpine would be unable to meet its revenue expectations and finance its expansion program. (*Id.* ¶ 239.) Thus, according to Plaintiffs, defendants were motivated to conceal Calpine's financial results and the true reason for the energy crisis to avoid compromising the success of Calpine's numerous debt offerings, which were necessary to fund Calpine's expansion. (*Id.* ¶ 240.) Plaintiffs further allege that defendants were motivated to conceal adverse information about the underlying causes of the energy crisis by their desire to negotiate contracts with California on enormously favorable terms. (*Id.* ¶ 241.)

### B. Procedural History

The initial securities class action complaint against defendants was filed by plaintiff Caroline Weisz on March 11, 2002. Fourteen other putative class actions were subsequently commenced against defendants, including two commenced by now-lead plaintiffs Mansukh B. Makadia and Laborers Local 1298 Pension Fund. In an Order filed on August 16, 2002, the Court consolidated the fifteen actions. On August 19, 2002, the Court filed an Order appointing Mansukh B. Makadia and Laborers Local 1298 Pension Fund lead plaintiffs for the putative class action.

On October 18, 2002, Plaintiffs filed an Amended Complaint for Violations of the Federal Securities Laws (the "AC") against Calpine, Cartwright, and Curtis. On January 21, 2003, pursuant to stipulation of the parties and Order of the Court, Plaintiffs filed the SAC, which names Calpine, the Individual Defendants, and Arthur Andersen LLP ("Andersen") as defendants. On April 8, 2003, the Individual Defendants filed the Individuals' Motion, and Calpine filed Calpine's Motion. On June 23, 2003, Andersen filed Arthur Andersen LLP's Motion to Dismiss Second Consolidated Amended Class Action Complaint ("Andersen's Motion"). On July 24, 2003, the Court filed an Order taking the hearing on the three pending motions off-calendar and taking them under submission.

On August 8, 2003, the Court granted Plaintiffs' motion to dismiss Andersen as a defendant.

## II. LEGAL STANDARD

### A. Motion to Dismiss Pursuant to Rule 12(b)(6) Generally

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim. *Navarro v. Block,* 250 F.3d 729, 731 (9th Cir.2001).

A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir.1997). The complaint is construed in the light most favorable to the plaintiff, and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *see also Everest & Jennings, Inc. v. Am. Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994). "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro*, 250 F.3d at 731.

Although the Court is generally confined to consideration of the allegations in the pleadings, "a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994). The Court may also consider matters of which it may properly take judicial notice without converting the motion to dismiss to one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994) (records and reports of administrative bodies); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988) (court records).

In adjudicating a motion to dismiss, the court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). Nor is the court "required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998); *see also Miranda v. Clark County, Nev.*, 279 F.3d 1102, 1106 (9th Cir.2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 987 (9th Cir.) ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), *amended*, 275 F.3d 1187 (9th Cir.2001); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir.1988) ("[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").

When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib., Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Leave to amend is properly denied "where the amendment would be futile." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir.1992).

### B. Heightened Pleading Requirements for Securities Fraud Claims

#### 1. Rule 9(b)

Plaintiffs' two Exchange Act claims, Counts I and II, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir.1994) (en banc). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). To comport with Rule 9(b), the complaint must allege the time, place, and content of the alleged fraudulent representation or

omission; the identity of the person engaged in the fraud; and the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions at issue] were false and misleading." *In re GlenFed,* 42 F.3d at 1547–48. Thus, a plaintiff must provide an explanation as to how an alleged statement or omission was false or misleading *when made. Id.* at 1548. The failure to plead fraud with the requisite particularity is grounds for dismissal. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987). Dismissal under Rule 9(b) is governed by the same standard applicable to Rule 12(b)(6). *Id.*

### 2. *The Private Securities Litigation Reform Act (PSLRA)*

Counts I and II are also subject to the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA). The PSLRA reiterates the particularity requirements of Rule 9(b). First, the complaint must specify "each statement alleged to have been misleading." 15 U.S.C. § 78u–4(b)(1). Second, it must specify the reason or reasons why the statement was false or misleading. *Id.* If an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. *Id.*

█ The PSLRA's third obligation moves beyond Rule 9(b)'s requirements. When pleading scienter, the PSLRA requires the complaint, with respect to each act or omission alleged to violate a provision of the Exchange Act, to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). In this Circuit, this heightened scienter pleading standard "requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate

or conscious recklessness"—a degree of recklessness strongly suggesting actual intent. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 979 (9th Cir.1999). Merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.*

### III. DISCUSSION

### A. *Requests for Judicial Notice*

### 1. *Defendants' Requests*

### a. *Individuals' Request*

The Individual Defendants have filed the Individual Defendants' Request for Judicial Notice in Support of Motion to Dismiss the Second Amended Complaint for Failure to State a Claim (the "Individuals' Request"). The Individuals' Request asks the Court to take judicial notice of three documents. The first consists of selected pages of a document purportedly issued by the SEC and obtained from the SEC website. The second and third documents consist of copies of Cartwright's and Curtis' Forms 3, 4, and 5 filed with the SEC. Plaintiffs have not filed any opposition to the Individuals' Request.

██ The Individuals' Request is proper. The first document pertains to SEC guidance on disclosure of non-GAAP measures such as EBITDA. (Individuals' Req. Ex. A.) Plaintiffs expressly cite and quote from this document in the SAC. (SAC ¶ 65.) In adjudicating a motion to dismiss under Rule 12(b)(6), the Court may properly take judicial notice of documents referenced in a complaint without converting the motion into one for summary judgment where the authenticity of the documents are not in dispute. *See Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994); *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994). Plaintiffs do not dispute the authenticity of this document.

The two other documents are also suitable for the taking of judicial notice. In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. *In re Nuko Information Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 341 (N.D.Cal.2000) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999), and *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)). Accordingly, the Court GRANTS the Individuals' Request in its entirety.

### b. *Calpine's Request*

Calpine has filed a Request for Judicial Notice in Support of Defendant Calpine Corporation's Motion to Dismiss Second Consolidated Amended Class Action Complaint ("Calpine's Request"). Calpine's Request asks the Court to take judicial notice of forty documents. These documents consist of various Calpine filings with the SEC and other documents that are either explicitly referenced in the SAC or on which relevant allegations in the SAC necessarily rely. Plaintiffs have not filed any opposition to Calpine's Request.

■ All of these documents are appropriate for judicial notice. As noted *supra*, the Court may properly take judicial notice of SEC filings and documents expressly referenced in the SAC without converting the motions to dismiss into motions for summary judgment. In addition, the Court may take judicial notice of documents on which allegations in the SAC necessarily rely, even if not expressly referenced in the SAC, provided the authenticity of those documents are not in dispute. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998). Plaintiffs have not disputed the authenticity of any of the documents at issue. Accordingly, the Court GRANTS Calpine's Request.

### 2. *Plaintiffs' Request*

■ Plaintiffs have filed a Request for Judicial Notice in Support of Plaintiffs' Opposition to Calpine Corporation's and Individual Defendants' Motions to Dismiss ("Plaintiffs' Request"). Plaintiffs' Request asks the Court to take judicial notice of two documents that were allegedly filed *after* the filing of the SAC: the "Final Report of Price Manipulation in the Western Markets," allegedly prepared by the staff of the FERC, specifically Chapter VI; and the "Analysis of Trading and Scheduling Strategies Described in Enron Memos," allegedly prepared by the Department of Market Analysis of the California ISO. Neither of these documents is referenced in the SAC, nor does any specific allegation in the SAC necessary rely on them. Defendants have filed a joint opposition to Plaintiffs' Request, arguing that these documents do not qualify for judicial notice because they are not rulings by administrative agencies and because Plaintiffs' Request mischaracterizes the reports.

Plaintiffs' Request is meritless. The Court is aware of no authority that allows a plaintiff to request judicial notice of a document filed after the filing of the complaint to which the document allegedly pertains, at least where no set of allegations in the complaint either refers to such a document or necessarily relies on it. In the context of the PSLRA, taking judicial notice of such matter seems particularly unwarranted: Upon the filing of a motion to dismiss, the PSLRA requires the Court to examine the *complaint* to determine whether there are sufficient allegations to state a claim for violation of the Exchange Act. *See* 15 U.S.C. § 78u–4(b)(1)–(3)(A). It is difficult to understand how documents not referenced in a complaint and on which the allegations of the complaint do not necessarily rely can be relevant to the

Court's determination. Accordingly, the Court DENIES Plaintiffs' Request.

But even if the Court could take judicial notice of the two documents at issue, the Court would not do so. Plaintiffs fail to explain how any of the cited or quoted portions of these documents are relevant to the allegations in their complaint. For example, Plaintiffs' Request references a "strategy" denoted by Plaintiffs as "Get Shorty (Sellback of Ancillary Services)" and states: "Table 6. Gains and Losses from Sellback of Ancillary Services, in which Calpine was listed among the top ten (of 35) generators of revenue from this strategy." (Pls.' Req. at 2.) No explanation is provided about the significance of this statement. Moreover, Plaintiffs fail to provide any page numbers for the ostensible quotations from the "Final Report of Price Manipulation in the Western Markets" or any explanation of the significance of these quotations. (*Id.*) [14]

Plaintiffs evidently believe that by continually mentioning "Enron," the Court will draw some conclusion about the significance of the documents at issue. Plaintiffs should disabuse themselves of any such belief and understand that the Court is not willing to speculate about the relevance of these documents where Plaintiffs provide no such explanation. They should also understand that the Court will not comb through voluminous documents to verify the accuracy of quotations allegedly taken from those documents where page numbers are not provided.

## B. Securities Act Claims

### 1. Applicability of Rule 9(b)'s Particularity Requirements to Securities Act Claims

Citing the Court's recent ruling in its Order filed on February 5, 2003, in *In re Turnstone Systems, Inc. Securities Litigation*, No. C 01–1256 SBA (*"Turnstone"*), Calpine argues that Federal Rule of Civil Procedure 9(b)'s particularity requirements apply to Plaintiffs' Securities Act claims, which allege violations of Section 11 of the Securities Act. Calpine claims that Rule 9(b) applies because the Securities Act claims "rest on allegations of fraud." In their opposition, Plaintiffs also invoke *Turnstone*, but for the opposite point: they argue that Rule 9(b) does *not* apply to their Securities Act claims. In its reply, Calpine seeks to distinguish the SAC from the complaint at issue in *Turnstone* by arguing that the Securities Act claims and the Exchange Act claims in the SAC share numerous allegations.

In *Turnstone*, the Court was presented with motions to dismiss and a complaint similar to the SAC. The complaint alleged violations of the Securities Act and the Exchange Act, but it separated out the allegations underlying the Securities Act claims from those underlying the Ex-

---

**14.** This wholly deficient practice is mirrored in Plaintiffs' opposition brief. Plaintiffs assert therein:

[A]s described in detail in the Request for Judicial Notice, Calpine was found presumptively to have engaged in four unlawful trading practices with Enron designed to "game" the California energy market. It is [sic] further found that the voluminous power and gas trades engaged in between Enron and traders such as Calpine, at prices far above market, created the impression of a liquid market and contributed to the Energy Crisis, allowing Calpine to recognize *$466 million* in inflated revenue for the quarter ended September 30, 2001. ([SAC] ¶ 80).

(Pls.' Opp. Br. at 20 (emphasis in original).) Plaintiffs do not provide a single citation to Plaintiffs' Request or the materials appended thereto in support of these assertions. Nor is the rationale for these assertions "described in detail" in Plaintiffs' Request. Thus, the Court has no basis on which to evaluate the accuracy of these assertions. The Court must disregard them.

change Act claims. *Turnstone* at 2 n.4. The allegations underlying the latter claims did not allege scienter on the part of the defendants, but rather that the defendants were essentially negligent. *Id.* at 33–36. The defendants asserted that, in accordance with *In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996), Rule 9(b)'s particularity requirements applied to the Securities Act claims because the complaint alleged a unitary course of conduct involving fraud on the part of defendants, and it was on this course of conduct that the Securities Act claims were premised. *Id.* at 23. The plaintiff responded that the holding of *In re Stac* did not apply because the complaint separated out the Securities Act allegations from the Exchange Act allegations and proceeded on a negligence theory of liability for the Securities Act claims. *Id.* at 23–24.

After ordering supplemental briefing, the Court undertook an extensive examination of the allegations in the complaint and the Ninth Circuit's pronouncements in *In re Stac* and its progeny. *Id.* at 23–36. The Court concluded that Rule 9(b)'s particularity requirements did not apply to the plaintiff's Securities Act claims because the statement of those claims in the complaint was separate and distinct from the statement of the plaintiff's Exchange Act claims and because there were no averments of fraud underlying the Securities Act claims. *Id.* at 33–36. The Court also ruled that the Ninth Circuit's holding in a decision handed down just days before the Court's Order, *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097 (9th Cir.2003), required it not to apply Rule 9(b) to the Securities Act allegations, but instead to "strip" any averments of fraud from the complaint when considering whether the plaintiff stated claims under the Securities Act. *Id.* at 36. Proceeding thus, the Court concluded that the plaintiff's Securities Act claims were cognizable.

■ Despite Calpine's efforts to distinguish the SAC from the complaint at issue in *Turnstone,* the Court finds the two complaints to be materially indistinguishable. Plaintiffs have separated out their allegations underlying the Securities Act claims from the allegations underlying the Exchange Act claims. Even though some allegations underlying the Securities Act claims reference allegations underlying the Exchange Act claims, none of these referenced allegations contain averments of fraud. In addition, using language virtually identical to pertinent language in the *Turnstone* complaint, the SAC asserts a negligence theory for violation of Section 11 of the Securities Act. (*Compare Turnstone* at 33 *with* SAC ¶ 274 ("None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements described above, which were contained in the Shelf Registration Statement, were accurate and complete in all material respects.").) Finally, even if the Securities Act claims contained averments of fraud, the proper approach under *Vess* would be to strip the averments of fraud from the SAC and determine whether the remaining allegations state claims for violations of the Securities Act. 317 F.3d at 1105. Accordingly, the Court concludes that Rule 9(b)'s particularity requirements do not apply to Plaintiffs' Securities Act claims.

### 2. *Actionability of Statements in Prospectuses*

#### a. *Statements Regarding Causes of Energy Crisis*

Plaintiffs allege in the SAC that the statements in the February Supplemental Prospectus and the October Supplemental Prospectus regarding the factors that allegedly reduced the supply of power to California and, consequently, increased

wholesale prices were materially false and misleading. (SAC ¶ 134–35.) Plaintiffs allege that the shortage of power supply was not caused by any of these factors but rather was attributable to the fact that power companies withheld capacity to drive up power prices. (*Id.* ¶ 135 (referencing *id.* ¶¶ 106–14).)

Both Calpine and the Individual Defendants contend that these statements could not have been false or misleading. Calpine argues that two documents invoked by Plaintiffs in the SAC, the California State Auditor's report of December 20, 2001, and the February 4, 2002, article by Professors Joskow and Kahn, do not support Plaintiffs' contentions: Calpine points out that the California State Auditor's report solely critiques the CDWR's performance in negotiating the long-term power contracts in early 2001, and the article by Professors Joskow and Kahn echoed virtually exactly what Calpine stated in the prospectuses about the factors that contributed to the shortage. Calpine further argues, as do the Individual Defendants in their motion, that Plaintiffs fail to plead specific facts to support their ostensibly unfounded statements of fact, such as that drought conditions did not exist in the Pacific Northwest during 2000.

Defendants' arguments fail for two reasons. First, they are largely based on the proposition that Rule 9(b) applies to Plaintiffs' Securities Act claims. Were this the case, the Court might be inclined to agree that Plaintiffs have failed to plead facts with particularity to support some of their assertions. Given that the Court has found that Rule 9(b) does not apply, however, Plaintiffs are not obligated to plead with particularity and may legitimately plead conclusory facts unsupported by particulars. Thus, for example, Plaintiffs need not provide further factual allegations to support their contention that drought conditions did not exist in the Pacific Northwest during 2000.

Second, defendants' arguments implicitly rely on the premise that the statements at issue could not have been false or misleading if the documents referenced by Plaintiffs are consistent with, or support in part, these statements. Although this premise would arguably be true if Plaintiffs were alleging solely that the statements were *false*, it does not take into account that Plaintiffs allege that these statements are also *misleading*. Here, a natural reading of the statements at issue suggests that even if the four factors identified therein are not the *exclusive* factors causing the shortage, they are at least the *principal* factors; one would reasonably expect that if they were not the principal factors, they would never have been identified in the prospectus. Moreover, the four factors have something in common: they all essentially involve matters over which power companies like Calpine had little or no control. Thus, the most reasonable reading of the statements at issue is to provide the view that a shortage of power supply, and therefore the run-up in wholesale prices, developed principally due to phenomena overwhelmingly outside power producers' control.

■ If, however, it is true (as the Court must assume) that power companies deliberately withheld capacity from the market, and that withholding caused a power shortage and thereby drove up wholesale prices, the statements in the prospectuses would be misleading: The reader would believe that the shortage in supply and consequent increase in prices were not the fault of power suppliers, when in fact the shortage would be substantially due to deliberate manipulation of the wholesale power market. Further, the statements would be *materially* misleading in that they would have misled a reasonable inves-

tor in Calpine's debt instruments to believe that he or she was investing in higher-quality debt (based on the strength · of Calpine's finances) than the debt in which he or she in fact was investing. *See Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir. 1994) (defining a "material" omission or misrepresentation for purposes of Section 11 claims as one that "would have misled a reasonable investor about the nature of his or her investment"). Specifically, a reasonable investor would surely want to know that power suppliers were engaged in market manipulation, as the investor might then be reluctant to purchase debt instruments from Calpine out of fear that the FERC might initiate proceedings to abrogate or reform the CDWR's long-term contracts with Calpine, possibly resulting in a significant loss of revenue—and a concomitant decrease in financial stability—that might cause the value of the debt instruments to decline. A reasonable investor would also want to know this information because it arguably would suggest that Calpine's business practices involved unseemly machinations, thereby alerting a prudent investor to be circumspect in deciding whether to invest in Calpine securities.

For these reasons, the Court concludes that Plaintiffs state a claim under Section 11 of the Securities Act based on the statements regarding the causes of the shortage of power supply to California in the aforementioned prospectuses.

**b. *Announcement of Terms of Contracts in February Supplemental Prospectus and October Supplemental Prospectus***

Plaintiffs allege in the SAC that the statements in the February Supplemental Prospectus regarding the terms of Calpine's February 6, 2001 $4.6 billion contract with the CDWR and the statements in the October Supplemental Prospectus regarding the terms of Calpine's other two

long-term contracts with the CDWR were materially false and misleading because the terms of these contracts "were unjust and unreasonable and subject to abrogation or reformation by the FERC for violation of the FPA." (SAC ¶¶ 136–39.) Both Calpine and the Individual Defendants contend that these statements are not actionable for the reasons expressed by Plaintiffs because (1) defendants did not have any duty to disclose that the CDWR contracts conceivably could be abrogated or reformed by the FERC and (2) Plaintiffs do not allege in the FERC that the CDWR contracts violated the FPA.

■ The Court agrees with defendants. It was no secret that the CDWR contracts were, by operation of law, subject to abrogation or reformation by the FERC if they were found to be unjust or unreasonable. Further, defendants are absolutely correct that nowhere in the SAC do Plaintiffs allege that the contracts were in fact found to be unjust and unreasonable; all the SAC alleges that is pertinent is that California officials renegotiated the contracts with Calpine. There is no allegation that Calpine admitted or recognized that the contracts were unjust and unreasonable within the meaning of Sections 205 and 206 of the FPA or that any tribunal made any finding to that effect. Surely one could *speculate* that, had the FERC made findings regarding the rates charged under the terms of the contracts, it would have found the rates to be unjust and unreasonable. But there is no basis on which the Court can *reasonably* infer that the rates were, at the time the prospectuses were issued, *in fact* unjust and unreasonable; for all the Court knows, Calpine may have agreed to reduction in rates solely to stave off costly legal proceedings that Calpine deemed unmeritorious and to curry favor with the public and with state and federal regulators.

Thus, even though Plaintiffs allege in the SAC that the terms of these contracts were unjust and unreasonable, (*id.* ¶¶ 137, 139), this allegation does not rest on a reasonable basis. As such, the Court is not obligated to accept these statements when considering the sufficiency of Plaintiffs' Securities Act claims. *W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Accordingly, the Court concludes that the statements in the prospectuses regarding the terms of Calpine's contracts with the CDWR are not actionable for the reasons asserted by Plaintiffs. The Court DISMISSES Plaintiffs' Securities Act claims to the extent they rely on these statements WITH LEAVE TO AMEND to allege a reasonable basis on which these statements could be deemed false or misleading when made.

### 3. *Control Person Liability*

Count IV of the SAC asserts a claim under Section 15 of the Securities Act against Cartwright, Curtis, and Clark. The Individual Defendants argue that Plaintiffs have failed to plead sufficient facts demonstrating that any of the Individual Defendants are "control persons" subject to liability under Section 15. In particular, they assert that Plaintiffs' device of alleging that the Individual Defendants are control persons "by virtue of their high-level positions," (SAC ¶ 265), is insufficient; they assert that Plaintiffs are required to allege facts establishing the Individual Defendants' "day-to-day control" of Calpine or actual involvement in drafting the statements at issue.

 The Court agrees with the Individual Defendants that the SAC insufficiently pleads control person liability against Cartwright, Curtis, and Clark. "To establish that someone is a 'controlling person' the complainant must show that there was a relationship between the controlling and controlled person and that ac-

tual power or influence was exerted over the alleged controlled person." *Durham v. Kelly,* 810 F.2d 1500, 1503–04 (9th Cir. 1987). The Section 15 defendant must have exerted actual control and have been a culpable participant in the alleged Securities Act violations. *See id.* at 1504 (citations omitted). Although Plaintiffs allege that these three defendants signed, *inter alia,* the Shelf Registration Statement, (SAC ¶¶ 26, 27, 29), they do not allege that any of them signed the February Supplemental Prospectus or the October Supplemental Prospectus, nor do they allege that they exercised any power or influence over the person or persons who prepared these two documents. Further, although Plaintiffs allege these three defendants' positions at Calpine (and, with respect to Curtis, his responsibilities), nowhere do they allege that Cartwright, Curtis, or Clark played a role in the preparation of the February Supplemental Prospectus or the October Supplemental Prospectus. Accordingly, the Court GRANTS the Individuals' Motion with respect to Count IV and DISMISSES Count IV WITH LEAVE TO AMEND to allege facts establishing control person liability under Section 15 of the Securities Act.

### C. *Exchange Act Claims*

Scattered throughout Calpine's SEC filings, press releases, news reports, and other documents, the statements that Plaintiffs claim to give rise to their Exchange Act claims fall into five categories: statements about (1) alleged accounting irregularities (overcapitalization of interest on debt, inconsistent accounting of hedge investments, EBITDA disclosures, and use of pooling-of-interests accounting method); (2) Calpine's transactions with Enron; (3) terms and conditions of the CDWR contracts (which, Plaintiffs contend, were unjust and unreasonable); (4) causes of the California energy crisis and wholesale en-

ergy price increases; and (5) earnings forecasts and expressions of corporate optimism. In light of the stringent pleading requirements of the PSLRA, Plaintiffs fail to state a claim under the Exchange Act based on any of these statements for the reasons discussed below. Accordingly, the Court DISMISSES the Exchange Act claims WITH LEAVE TO AMEND.

### 1. *Alleged Accounting Irregularities*

### a. *Alleged Overcapitalization of Interest on Debt*

■ Defendants contend in their motions that Plaintiffs allege no facts demonstrating that Calpine's alleged "overcapitalization" of interest on debt was improper. The Court agrees. Plaintiffs nowhere allege in the SAC that this practice violated any accounting standard, such as GAAP.[15] Plaintiffs do allege that "[a]ccording to GAAP, a company can capitalize interest on debt incurred for construction in progress. If there are no borrowings that are project specific, a company is required to use a weighted average interest rate for purposes of capitalization." (SAC ¶ 51.) But Plaintiffs do not reference what provision of GAAP they are ostensibly invoking, nor do they precisely explain how Calpine's capitalization practices ran afoul of GAAP. Tellingly, Plaintiffs never in fact allege that Calpine should have used a weighted average interest rate. Therefore, the Court has no reasonable basis to infer that Calpine's calculation of interest on debt violated GAAP or was otherwise improper.

More fundamentally, Plaintiffs' assertion that the capitalization figures were false or misleading fails because it rests on an implicit premise that is far from obvious: that the rate at which interest on debt is capitalized should be equal to the rate at which interest on debt is expensed. While this premise may have intuitive appeal, Plaintiffs never explain why deviation from strict adherence to such parity renders a company's financial statements false or misleading. Many principles and methods of accounting are not intuitive, yet they are standard. Without any such explanation, Plaintiffs' assertion of duplicity is inherently untenable in light of the allegations in the SAC.

Given that the SAC fails to specify why this practice is false or misleading, Plaintiffs have further failed to establish a strong inference of scienter on the part of any defendant. For these reasons, the Court concludes that, based on the allegations of the SAC, the statements involving alleged overcapitalization of interest on debt are not false or misleading and that Plaintiffs have failed to sufficiently plead scienter for any defendant.

### b. *Alleged Inconsistent Accounting of Hedge Investments*

■ Defendants assail Plaintiffs' contention that Calpine failed to consistently account for certain hedge investments in 2001 on the ground that Plaintiffs do not allege that Calpine did anything improper. The Court agrees. Plaintiffs discuss in the SAC what is required under FAS 133 and "Mark–to–Market" accounting, and they

---

**15.** In their opposition brief, Plaintiffs assert: "According to SFAS No. 34, the interest incurred on specific borrowing associated with construction expenditures may be used as the capitalization rate. If new construction expenditures exceed specific new borrowing, the interest capitalization rate should be a weighted average rate applicable to certain

other borrowing." (Pls.' Opp. Br. at 23.) Plaintiffs provide no legal or evidentiary citations in support of these assertions. Accordingly, the Court declines to consider them. Moreover, their relevance is unclear because Plaintiffs do not indicate that these assertions are tied to any allegation in the SAC.

explain the difference between "fair value hedges" and "cash flow hedges." (*Id.* ¶ 53–57.) But they do not provide any allegations establishing that Calpine did anything improper. For example, Plaintiffs assert that Calpine's treatment of all but approximately $17 million of $67.3 million in commodity derivative losses as cash flow hedges enabled it to avoid showing them on its income statement so the losses would not adversely affect earnings, (*id.* ¶ 59), but nowhere do they allege that Calpine's treatment of these losses violated the strictures of FAS 133 or any other accounting principles.

Plaintiffs' arguments in their opposition confirm the accuracy of the Court's analysis. They assert that the SAC "explains how Defendants' inconsistent application of FAS 133 enabled Calpine to report inflated earnings for" several financial periods, (Pls.' Opp. Br. at 24), but the paragraphs of the SAC that they cite do not specify how this practice was improper, (*see* SAC ¶¶ 59, 60, 62, 144, 160), or how it might otherwise have been false or misleading. Plaintiffs evidently believe that the Court should infer from Calpine's use of accounting methods that produced relatively higher earnings that Calpine acted improperly. The Court cannot reasonably draw such an inference.

Accordingly, Plaintiffs have failed to sufficiently plead that these statements were false or misleading or that any defendant had the requisite state of mind. Therefore, these statements do not give rise to a cognizable Exchange Act claim.

### c. *Alleged False EBITDA Disclosures*

■ Defendants argue that Plaintiffs' attacks on Calpine's EBITDA disclosures as misleading are baseless. The Court has little difficulty reaching the same conclusion that defendants have reached. Plaintiffs do not explain either in the SAC or in their opposition brief why Calpine's use of

a non-GAAP measures such as EBITDA is inherently misleading. One would expect that if the use of non-GAAP measures by itself were actionable under the Exchange Act, corporations would have ceased using such measures a long time ago. In addition, as defendants note, Plaintiffs fail to suggest an alternative calculation of EBITDA that would be less misleading than the calculation used by Calpine. Further, by the very allegations of the SAC, Calpine's practice of disclosing its calculation of EBITDA in its financial statements complied with the SEC release entitled "Frequently Requested Accounting and Financial Reporting Interpretations and Guidance." (*See* SAC ¶¶ 65, 144, 159, 166, 176, 195.)

The only superficially plausible basis for Plaintiffs to criticize Calpine's disclosure of EBITDA figures is the alleged noncompliance with the direction in the letter sent to Clark by the SEC's assistant director of corporation finance to retitle its EBITDA measure as "ebitda, as adjusted." (*Id.* ¶ 66.) But nowhere in this letter did the SEC official opine that Calpine's practice was materially misleading. Nor do Plaintiffs identify which statements in particular that were issued after the sending of the letter were improper for this reason. The Court cannot conclude that, where Calpine's calculation of its EBITDA measure was expressly and accurately provided in its financial statements, a reasonable investor would have been misled by Calpine's use of their EBITDA figures. Accordingly, the Court concludes that the use of these figures cannot give rise to an actionable Exchange Act claim for the reasons expressed in the SAC.

### d. *Alleged Improper Use of Pooling-of–Interest Method of Accounting*

■ Defendants contend that Plaintiffs' allegations about Calpine's use of the

pooling-of-interest method of accounting are not actionable. The Court fully agrees. Plaintiffs' claims are not even colorably valid. They fault defendants for utilizing this accounting method for a merger between Calpine and Encal that took place in April 2001. (*Id.* ¶¶ 69–70.) But Plaintiffs' own allegations in the SAC establish that the SEC approved of this method *from 1970 to June 2001;* it was not until June 2001 that the SEC issued Financial Accounting Standard No. 141, which called for use of a different method of accounting. (*Id.* ¶ 68.) Thus, Plaintiffs are seeking to hold defendants liable for engaging in a practice that was expressly approved by the SEC at the time defendants engaged in the practice.[16] If that fact alone does not demonstrate that Calpine's use of the pooling-of-interest method of accounting was not misleading, it surely demonstrates that no defendant can be considered to have acted with scienter under the allegations of the SAC. Accordingly, the statements utilizing this method of accounting are not actionable on the basis of the reasons provided in the SAC.

### 2. *Calpine's Transactions with Enron*

■ Calpine contends that Plaintiffs have insufficiently alleged that Calpine's accounting of its transactions with Enron was false or misleading. Again, the Court agrees. One of Plaintiffs' key themes with regard to the Enron transactions is that they were used to inflate revenue. But as Calpine accurately notes, although the SAC points to the assertion in the December 9 Article that Calpine sold power to Enron at "inflated prices" in the third quarter of 2001, (SAC ¶¶ 73–74), neither Plaintiffs nor the article identifies a single

transaction where overcharging occurred. More importantly, Plaintiffs nowhere allege facts establishing why Calpine's charging Enron higher prices were improper; they simply imply by innuendo, and apparently also through guilt by association, that there was mischief afoot. If the Court is to find that the pertinent allegations in the SAC satisfy the PSLRA's heightened pleading standards, Plaintiffs must be able to provide some explanation of why Calpine's transactions were improper; merely asserting that the transactions led to increased earnings for Calpine does not demonstrate that Calpine's engaging in or accounting of these transactions was false or misleading. Plaintiffs cannot carry their pleading burden by asking the Court to undertake pure speculation about the nature of Calpine's transactions with Enron.

■ Similarly, Plaintiffs' allegations that Calpine's use of "swaps" or "wash trades" with Enron rendered Calpine's financial statements false or misleading, (*see id.* ¶¶ 73, 75), are insufficiently pleaded. As Calpine correctly notes, Plaintiffs do not identify any documents or employees to corroborate these assertions, nor does the December 9 Article describe Calpine's January 2001 contract with Enron as a swap contract. None of the 31 transactions identified by Calpine in its May 31, 2002 press release that resulted in the simultaneous purchase and sale of the same electricity product between the same counterparties (which transactions are characterized by Plaintiffs as "wash trades") were identified as involving Enron. (*Id.* ¶ 224.) Nor can the Court strongly infer scienter on the part of any

---

16. Even though Plaintiffs challenge statements regarding the merger appearing in Calpine's Second Quarter 2001 10–Q—which was issued in August 14, 2001, (*id.* ¶ 188), *after* FAS No. 141 took effect—these statements made clear that the merger *"was* accounted for under the pooling-of-interests method," (*id.* ¶ 70). Thus, there is no indication that Calpine used the pooling-of-interest method after FAS No. 141 took effect.

defendant where these transactions were but 31 of more than 72,000 transactions over 2000 and 2001 and represented approximately one-tenth of one percent of 2001 total revenue.

In sum, Plaintiffs seek to hold defendants liable on the grounds that Calpine charged Enron higher prices than other customers and because Calpine engaged in a relatively tiny volume of wash trades with unspecified persons or entities. For the reasons expressed above, the pertinent allegations of the SAC are insufficient under the PSLRA.

### 3. *Terms of Calpine's Contracts with the CDWR*

Plaintiffs claim that Calpine's announcements of the terms of Calpine's contracts with the CDWR were materially false and misleading because Calpine failed to disclose that the terms of those contracts were unjust and unreasonable and because the contracts were subject to abrogation or reformation by the FERC. These statements are not actionable on the bases asserted by Plaintiffs for the reasons set forth *supra* in Part III.B.2.a.

 In addition, Plaintiffs have failed to sufficiently plead facts giving rise to a strong inference of scienter on the part of any defendant, including Macias. Plaintiffs allege, for example, that at the time that the contracts began to be negotiated, "the Energy Crisis was at its peak, a fact that made Calpine well aware of its bargaining advantage." (*Id.* ¶ 86.) But it does not follow from the fact that Calpine may have been able to secure contracts with relatively more advantageous terms that Macias or any other defendant knew that the terms ultimately reached were unjust and unreasonable. After all, a competitive price for any commodity is determined by supply and demand, which may vary at any given time.

Similarly, Plaintiffs point to the California State Auditor's report that found that the CDWR lacked the infrastructure and the experienced, skilled staff required to negotiate effectively. (*Id.* ¶ 98.) Plaintiffs also allege that one of the contracts provided that Calpine could obtain $80 million to $90 million per year of "capacity payments" even if Calpine was unable to provide any capacity during all but one of the twenty-years of the contract. (*Id.* ¶ 91.) But, even assuming these allegations are true, it does not follow that Macias or any other defendant knew or even should have known that Calpine was reaching terms in the contracts with the CDWR that might have violated Sections 205 and 206 of the FPA.

In short, Plaintiffs' theory is that given that these were unusual times, the contracts contained terms and conditions unusually advantageous to Calpine, and (it now appears in hindsight) the CDWR's staff lacked sufficient skills or experience to negotiate effectively, defendants either knew or recklessly disregarded the possibility that the terms of these contracts were unjust and unreasonable. While such a theory and the pertinent allegations in the SAC might be viable if defendants were held to a negligence standard, or perhaps even a gross negligence standard, they cannot reasonably be considered to establish a strong inference of knowledge or recklessness.

For these reasons, the statements about the terms of Calpine's contracts with the CDWR do not provide a basis for Plaintiffs' Exchange Act claims under the theory asserted by Plaintiffs in the SAC.

### 4. *Causes of California Energy Crisis and Price Increases*

Defendants assail Plaintiffs' assertions that defendants are liable for statements about the causes of the California energy

crisis and the increases in wholesale prices. Even though the Court concluded that these statements are actionable under Section 11 of the Securities Act in Part III.B.2.a *supra,* this conclusion does not require the same result with respect to Plaintiffs' Exchange Act claims because these claims, unlike the Securities Act claims, are subject to the heightened pleading standards of the PLSRA.

■ The Court, however, need not reach whether Plaintiffs have adequately pleaded that the relevant statements were false or misleading because the Court readily concludes that Plaintiffs have failed to plead sufficient facts establishing a strong inference of scienter on the part of any defendant. Plaintiffs' theory of scienter in connection with these statements is that because defendants allegedly had access to certain information about the causes of the energy crisis, defendants either knew or recklessly disregarded such information. Even assuming that such information was available to defendants, this theory is not viable. A report may literally be "available to the public" or available to defendants even though it is not widely publicized or distributed. To conclude that defendants knew or recklessly disregarded any relevant report that was publicly available would effectively impose on them an obligation to know any relevant information publicly available anywhere in the country. The Court discerns no basis, legal or otherwise, on which to impose such an extreme and unprecedented obligation.

Yet even if such obligation existed, it does not follow that defendants were reckless in not knowing about the pertinent reports. Absent additional allegations about the extent to which defendants should have known about the existence of those reports, the most the Court could infer would be that defendants were negligent, or possibly grossly negligent, in not

being aware of information that tended to show that the energy crisis was the product of manipulation of the market for power.

■ But the foregoing discussion is to a certain degree academic because Plaintiffs fail to plead with sufficient particularity that the relevant information was available to defendants. Plaintiffs allege that "ISO data" were readily known and available to power providers like Calpine. (SAC ¶ 105.) But Plaintiffs do not specify the source of these data or when they may have been made public. Moreover, Plaintiffs allege that the data were available to power companies *like* Calpine; they do not actually allege that they were available to *Calpine.* The Court thus has no basis on which to infer that such data was available to Calpine.

Similarly, Plaintiffs discuss in length a report issued by the WSCC that was described in Congressional testimony by Robert McCullough. (*Id.* ¶¶ 107–09.) But nowhere does the SAC specify when or how the WSCC provided the data in this report to WSCC members such as Calpine. Plaintiffs invoke Congressional testimony given by the Chairman of the independent Market Surveillance Committee ("MSC") on May 15, 2002, but the quoted testimony provides only a discussion of how an unspecified firm exercises unilateral market power. (*Id.* ¶ 110.) Plaintiffs reference an MSC report finding that the energy price inflation was the result of the exercise of market power that was allegedly issued on November 21, 2000, but Plaintiffs do not state that this report was publicly available, let alone during the Class Period. (*Id.* ¶ 111.) Plaintiffs invoke yet another MSC study that allegedly was issued on March 21, 2001, but again Plaintiffs do not allege that this report was publicly available. (*Id.* ¶ 112.) Finally, Plaintiffs reference a report issued by the California

PUC on September 17, 2002, but the alleged issuance occurred after the Class Period. (*Id.* ¶ 113.)

 Plaintiffs' fall-back positions on scienter are unavailing. Plaintiffs allege that defendants acted with scienter because they had motives and opportunities to commit securities fraud. Specifically, they allege, in essence, that defendants wished to present better earnings statements so that Calpine could maintain access to the credit markets and that the Individual Defendants wished to maximize their executive compensation packages. As the Individual Defendants accurately note, allegations of a motive to present better financial statements to secure credit or to engage in similar business activities are insufficient to establish a strong inference of scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir.2002). The motive to increase the Individual Defendants' compensation is also insufficient. *See In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 998–99 (D.Ariz.1999). With regard to the latter argument, the Court is particularly hesitant to find a strong inference of scienter because doing so would imply that a securities fraud plaintiff can automatically establish a strong inference of scienter whenever an executive's compensation is tied to the performance or stock price of the company for which he or she works. Such a result would appear inconsistent with the intent of the PSLRA.

Plaintiffs also allege that scienter is shown by Cartwright's and Curtis' stock sales during the Class Period. The Ninth Circuit has held that "suspicious" or "unusual" stock sales may be probative of scienter for purposes of an action under § 10(b) and Rule 10b–5. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). However, "[i]nsider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Vantive*, 283 F.3d at 1092 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir.2001)). The Ninth Circuit has identified three factors that district courts should consider in making this determination: "'1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history.'" *Id.* (quoting *Ronconi*, 253 F.3d at 435).

 Cartwright's and Curtis' stock sales identified in the SAC are insufficient to provide a basis for liability under § 10(b) and Rule 10b–5. Their stock sales are not sufficiently suspicious or unusual to give rise to a *strong* inference of scienter, as required to maintain a securities fraud claim under the PSLRA in the Ninth Circuit. *See In re Silicon Graphics*, 183 F.3d at 974. During the Class Period, defendants Cartwright and Curtis sold 3.90% and 13.85% of their holdings, respectively. These percentages alone are not inherently suspicious. *See id.; In re Vantive*, 283 F.3d at 1094; *Ronconi*, 253 F.3d at 435; *In re PetSmart*, 61 F.Supp.2d at 1000; *In re FVC.COM Sec. Litig.*, 136 F.Supp.2d 1031, 1039 (N.D.Cal.2000). Moreover, as the Individual Defendants note, Cartwright and Curtis retained approximately 95% of their collective shares. The Court cannot strongly infer that defendants knew about or recklessly disregarded the alleged information about the true causes of the energy crisis and run-up in prices where the percentages of holdings sold by Cartwright and Curtis were relatively small; as far as the Court can tell, Cartwright and Curtis may have innocently sold the stock to reap profits result-

ing from a relatively high price of Calpine stock.

For these reasons, the statements regarding the causes of the energy crisis and the increase in energy prices do not form a cognizable basis for Plaintiffs' Exchange Act claims against defendants.

### 5. Earnings Forecasts and Expressions of Corporate Optimism

Defendants contend that Plaintiffs have failed to plead with particularity how statements of earnings forecasts were false or misleading and that the qualitative statements of corporate optimism are not actionable. The Court agrees with both of defendants' arguments. Plaintiffs do not identify in their opposition brief the allegations that render these statements false or misleading, (see Pls.' Opp. Br. at 25–26), and the Court does not discern any such particularized allegations in the SAC.[17] As for qualitative statements of optimism, the operative words that Plaintiffs assail in the various statements are "strong," (SAC ¶¶ 140, 143, 163, 178, 193, 197), "healthy," (id. ¶ 174), and "solid," (¶ 193). This Court has previously found such words to be far too vague to be actionable under the PSLRA. In re Splash Tech. Holdings Inc. Sec. Litig., 160 F.Supp.2d 1059, 1077 (N.D.Cal.2001) (finding statements using the words "strong," "robust," "well positioned," "solid," and "improved" to be vague and inactionable); see also Turnstone at 60–61. Accordingly, these state-

ments cannot form a basis for Plaintiffs' Exchange Act claims.

### 6. Control Person Liability

The Ninth Circuit applies the same test for control person liability for purposes of Section 20(a) of the Exchange Act that it applies for purposes of Section 15 of the Securities Act. See Durham v. Kelly, 810 F.2d 1500, 1503 (9th Cir.1987) (citing Pharo v. Smith, 621 F.2d 656, 672–73 (5th Cir.1980)). Accordingly, for this additional reason the Court DISMISSES Count II WITH LEAVE TO AMEND for the reasons that it is dismissing Count IV, which are set out in Part III.B.3 supra.

### IV. CONCLUSION

Plaintiffs allege an actionable Section 11 claim under the Securities Act based on the statements in the February Supplemental Prospectus and the October Supplemental Prospectus about the causes of the California energy crisis and the increase in wholesale energy prices. All of the other claims are not actionable. They are dismissed with leave to amend to allege matter that rectifies the deficiencies identified above. Plaintiffs are admonished to read this Order carefully and not to allege any matter inconsistent with the Court's analysis and conclusions. The Court will not tolerate being forced to revisit issues regarding the sufficiency of

---

17. For example, Plaintiffs contend in their opposition brief that defendants had no reasonable basis to announce that Calpine's earnings would exceed expectations and that by the end of 2001, Calpine would have brought a large amount of clean, low-cost power to the market. (Id. at 26 (citing SAC ¶¶ 186, 197).) The only explanation that Plaintiffs provide for this contention are that, at the time the statements were made, defendants knew that several of its long-term contracts, including those with the CDWR, were unreasonable and unjust. (Id.) But that as-

sertion fails for the reasons discussed supra Part III.B.2.b. Plaintiffs add that at the time the statements were made, the California State Auditor had commenced an audit of Calpine's contracts with the CDWR. (Id.) But the report ultimately issued by the California State Auditor did not find these contracts to be unreasonable and unjust, but rather faulted the lack of experience of CDWR staff in negotiating the contracts. (SAC ¶ 98.) Thus, Plaintiffs' contention that defendants lacked a reasonable basis to make the aforementioned announcements is unsupported.

allegations that it has resolved in this Order.

The Court leaves Plaintiffs the following admonition. Although the Court has striven to maintain a dispassionate and measured tone in discussing Plaintiffs' Exchange Act allegations, Plaintiffs should not assume that by using that tone, the Court does not find their arguments inappropriate. To the contrary, the Court perceives numerous arguments and assertions in the SAC and Plaintiffs' opposition brief that are completely baseless. For example, Plaintiffs allege that during an August 28, 2001 conference call with analysts (in which Cartwright, Curtis, Posoli, and Macias participated), Calpine officials said that there were no discussions underway to renegotiate the long-term contracts with the CDWR. Plaintiffs allege that these statements were materially false and misleading because Calpine knew, at the time such statements were made, that the CDWR contracts were unjust and unreasonable and, consequently, subject to abrogation or reformation by the FERC for violations of the FPA. Plaintiffs' theory for why this statement was materially false and misleading is obviously inconsistent with simple logic: even assuming that the CDWR contracts were unjust and unreasonable, it does not plausibly follow that the statement that there were no discussions underway to renegotiate the contracts was false or misleading; the statement made a straightforward, accurate assertion of fact about whether discussions were underway.

Along these lines, the Court finds also troubling Plaintiffs' unwarranted use of innuendo to allege that defendants committed securities fraud. Plaintiffs repeatedly invoke Enron, even going so far as to introduce in the SAC patently irrelevant allegations, such as that a particular former Enron energy trader pleaded guilty in October 2002 to practicing fraudulent schemes during the energy crisis. They also repeatedly assail Calpine's alleged use of "swaps" and "wash trades." But Plaintiffs never actually explain why Calpine's dealings with Enron and the use or accounting of swaps and wash trades were improper. Plaintiffs evidently desire the Court to infer by innuendo that Calpine violated federal securities laws by engaging in these activities. As discussed above, the Court cannot, and will not, do so.

The Court is thus left with the distinct impression that Plaintiffs have scattered throughout the SAC every statement that could plausibly be considered actionable under the most superficial analysis without taking pains to filter out those that are either inherently not actionable or those that cannot be actionable under the theories that Plaintiffs assert. Plaintiffs seem to believe that by throwing as many allegations at the Court and defendants as possible, one will somehow slip by the Court and "stick." This practice is utterly unacceptable, and Plaintiffs' refusal to subject their allegations and theories to serious scrutiny before inserting them in the SAC has wasted the Court's time. The Court reminds Plaintiffs that under 15 U.S.C. § 78u–4(c), the Court is *required* upon the adjudication of this action to review the pleadings and the papers filed in connection with any dispositive motion and to make specific findings as to each party's and party's attorney's compliance with Federal Rule of Civil Procedure 11(b); and if the Court finds that any party or attorney has violated Rule 11(b), the Court is *required* to impose sanctions under Rule 11.

Finally, Plaintiffs request leave to amend "in view of the fact that new evidence is fast unfurling from governmental authority showing the culpability of Calpine and its officers and directors in manipulating the California energy market."

Even though the Court is granting Plaintiffs leave to amend their complaint, they should not be under the illusion that it is doing so because "new evidence is fast unfurling." Aside from the lack of support for it, this assertion is unpersuasive because the Court expects Plaintiffs to have a good-faith basis for filing suit *at this very moment.* Plaintiffs should not believe that the Court will maintain the pendency of this litigation solely to allow Plaintiffs to search for additional evidence to support the allegations in their complaint that they should have located before filing suit in the first place.

Accordingly,

IT IS HEREBY ORDERED THAT Arthur Andersen LLP's Motion to Dismiss Second Consolidated Amended Class Action Complaint [Docket No. 146] is DENIED AS MOOT.

IT IS FURTHER ORDERED THAT the Individual Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint for Failure to State a Claim [Docket No. 124] and Defendant Calpine Corporation's Motion to Dismiss Second Consolidated Amended Class Action Complaint [Docket No. 129] are GRANTED IN PART AND DENIED IN PART, such that the SAC is DISMISSED WITH LEAVE TO AMEND as follows:

1. Count III is cognizable as pleaded in the SAC against all defendants named in connection therewith, but *only* to the extent that it is based on the statements set out in paragraph 134 of the SAC for the reasons identified in paragraph 135 (and other paragraphs referenced therein) of the SAC;

2. For the reasons set out in the body of this Order, Plaintiffs have not pleaded facts sufficient for Counts I, II, and IV to be cognizable;

3. Plaintiffs are granted leave to file and serve a Third Consolidated Amended Class Action Complaint (the "TAC") to cure the deficiencies identified in the body of this Order *no later than September 29, 2003,* provided, in addition, that for *each* false and/or misleading statement that Plaintiffs allege to give rise to liability under the Exchange Act, Plaintiffs shall—[18]

 a. State the false or misleading statement;

 b. State whether the statement was written or oral;

 i. If the statement was written, identify the document in which it appeared—that is, provide the title and author of the document, the date it was prepared, and, if not a publicly-available document, the name of the person or persons who reviewed it;

 ii. If the statement was oral, state when and under what circumstances the statement was made, and by whom in particular (merely alleging that "defendants" made the statement is insufficient); if an allegation regarding an oral statement is not made on personal knowledge, state with particularity all facts upon which Plaintiffs formed the belief that one or more of the defendants made the statement at the time and place at which it is alleged to have been made;

 c. State why the statement was false or misleading at the time it was made, and state with particularity all facts upon which Plaintiffs formed the belief that the statement was false or misleading;

---

**18.** These conditions are borrowed from similar conditions that Judge Hamilton placed on leave to amend a complaint she dismissed in

*In re Harmonic, Inc. Securities Litigation,* 163 F.Supp.2d 1079, 1099–1100 (N.D.Cal.2001).

i. If Plaintiffs allege that the falsity of the statement is shown by conflicting information in internal reports, identify the report (title, author, date prepared, recipient(s)) and indicate the portion of the report that contradicts the false or misleading statement;

ii. If Plaintiffs allege that the falsity of the statement is shown by contemporaneous information inconsistent with a particular statement, state with particularity what the contemporaneous information was, what the sources of the information was, who had the information, and how Plaintiffs learned of the information;

d. State particular facts giving rise to a strong inference of the required mental state;

i. If Plaintiffs allege that defendants received or possessed documents or information that was at odds with the alleged false or misleading statement, state all the relevant facts supporting this belief;

ii. If Plaintiffs allege that the information was contained in documents, state the title, date, and contents of such documents (with particularity), the identity of the person or persons who drafted such documents, the identity of the person or persons who reviewed such documents, how Plaintiffs learned of the existence of the documents; and how Plaintiffs know that defendants received these documents;

iii. If Plaintiffs allege that the information was in a form other than written, state the source or sources of their information (how they learned of this information allegedly possessed by defendants) and how they know that defendants possessed this information;

e. If Plaintiffs allege that forward-looking statements attributed to defendants were false and misleading, Plaintiffs must allege materiality, lack of meaningful cautionary language, and actual knowledge of the speaker;

f. If Plaintiffs do not intend to allege that any of the statements attributed to defendants were false, they must state that intention clearly; if Plaintiffs allege that the statements attributed to defendants were misleading only by virtue of the fact that they omitted to state additional present facts, they must state that clearly; they must also state with particularity the material fact or facts that are necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading;

4. *If Plaintiffs fail to file a TAC by September 29, 2003. Plaintiffs' claims will be dismissed with prejudice in their entirety without further notice to Plaintiffs;*

5. If Plaintiffs file and serve a TAC, defendants shall file and serve an answer, a motion to dismiss, or other responsive paper(s) *no later than November 4, 2003,* but any motion to dismiss shall not repeat any argument considered by the Court and rejected in this Order unless new allegations in the TAC make reassertion of the argument appropriate in light of new circumstances;

6. If any of defendants file one or more motions to dismiss, Plaintiffs shall file and serve all oppositions **no later than December 2, 2003;**

7. All replies to such oppositions shall be filed and served **no later than December 16, 2003;**

8. The hearing on any motion(s) to dismiss shall take place on *January 13, 2004, at 1:00 p.m.*

IT IS FURTHER ORDERED THAT if, in accordance with the guidelines above, Plaintiffs file a TAC and defendants file an answer, the parties shall forthwith meet and confer and, *no later than November 7, 2003,* lodge with the Court a stipulation and proposed order setting forth a date and time for a telephonic Case Management Conference with the Court to be initiated by Plaintiffs' counsel, which shall occur *no later than December 5, 2003,* assuming availability of the Court. Prior to submitting the stipulation and proposed order, Plaintiffs are advised to contact the undersigned's courtroom deputy clerk to ascertain available dates and times for a Case Management Conference with the Court. The stipulation and proposed order shall also state that the parties shall file a Joint Case Management Statement no later than ten (10) days prior to the Case Management Conference.

IT IS SO ORDERED.